CAMPBELL, Etc. *v.* PATTON, Infant, etc., et al.

[No. 45, September Term, 1961.]

126

*Decided December 6, 1961.*

The cause was argued before HENDERSON, HAMMOND, HORNEY, MARBURY and SYBERT, JJ.

▮▮▮▮▮▮▮▮

*William B. Somerville,* with whom were *Paul E. Burke, Jr.,* and *Smith, Somerville & Case* on the brief, for the appellant Campbell.

*Walter W. Dawson* and *Irvine H. Rutledge,* with whom were *E. Stuart Bushong* and *Fenton L. Martin* on the brief, for the appellant Baltimore & Ohio Railroad Company.

*John Brockenbrough Fox,* with whom was *Stuart F. Hamill, Jr.,* on the brief, for the appellees.

MARBURY, J., delivered the opinion of the Court.

Separate suits were brought by Sandra Jean Patton, infant, Mary Jane Lee, infant, and their parents, against Leroy A. Campbell, and The Baltimore and Ohio Railroad Company to recover damages for injuries sustained when a school bus, owned and operated by Campbell, was struck by B. & O. train No. 4, the Diplomat, at the Mt. Lake—Loch Lynn crossing in Garrett County on September 10, 1959. The cases were consolidated and tried together before a jury (Fraley, J., presiding).

The narrs allege that Campbell was negligent, among other things, in driving the bus onto the tracks in front of the oncoming train, in stalling it on the tracks, and in failing to take proper measures to safeguard the children on the bus after it stalled; and that the railroad's agents were negligent, among other things, in operating the passenger train at a high rate of speed, in a careless and negligent manner, approximately one-half of a mile west of the crossing on straight track, with knowledge and view of the peril created by the stalled school bus in ample time to have stopped the train before impact, failed at that time to apply emergency brakes, and permitted the train to travel a great distance before the brakes were applied, thereby causing the train to crash into the school bus and injure the infant plaintiffs.

The jury returned its verdicts upon special issues submitted to them in favor of the plaintiffs and against both defendants, and judgments were entered accordingly, from which four appeals were brought here.

On the morning of September 10, 1959, at approximately 8:30 A. M., a school bus operated by the appellant, Campbell, carrying twenty-seven school children, stalled on the railroad tracks at the Mt. Lake crossing and was struck by an eastbound B. & O. passenger train, which was running about ten minutes late at the time.

Campbell had operated a school bus under contract for the Garrett County Board of Education for eight years prior to the accident, having been assigned the same route the previous five years. Operation of this route called for his arrival at the Mt. Lake crossing at about the same time every morning. The Mt. Lake crossing is situated on the edge of Loch Lynn where Paul Street crosses, at right angles, the B. & O. main line tracks, into Mt. Lake Park, immediately across the tracks. Paul Street is 26 feet wide, and runs north and south. The tracks run east and west. Although "bumpy" there was no substantial defect in the crossing. Approaching the crossing from the south the grade is 3%, approaching from the north it is 4.5%.

The crossing consists of three tracks, a spur track on the south, an eastbound track in the middle, a westbound track on the north. The school bus was traveling in a northerly direction as it approached the Mt. Lake crossing. On the south, or Loch Lynn, side of this crossing the State Roads Commission had painted lines on Paul Street 13 feet south of the spur track, indicating the proper place for vehicles to stop. These lines are 44 feet 2 inches from the south rail of the eastbound main line track, on which the train approached. Between the lines on the pavement and the eastbound main track is the spur track. The north rail of the spur track is 31 feet 3¾ inches from the south rail of the eastbound track. The crossing slopes downgrade from south to north. It is protected by the usual crossarms, bell and flasher lights which were designed to give warning of an approaching train when it reached a signal switch 2250 feet west of the crossing.

From the center of the crossing the two main line tracks run straight west for 2600 to 2700 feet, then gradually curve to the right to a point where the farthest view of the crossing from the west by a person standing on the tracks was 3120

feet, and proceed for a mile or so through open country into Oakland.

Along the south side of the eastbound track between the curve and crossing are located several objects which are material to these cases. The control which activates the signals at the crossing is located 2250 feet west of the crossing. The whistle post is located 1683 feet west of the crossing. A "home" signal is located 1291 feet west of the crossing. An order board is located 591 feet 1 inch west of the crossing and is in front of the center of the structure known as the Mt. Lake Park tower.

The train consisted of three diesel units and eight cars, with an overall length of 824 feet 2¼ inches. The three diesel units had a combined length of 192 feet.

The distance from the center of the crossing to the point of rest of the bus after the accident was 113 feet. The distance from the center of the crossing to the head of the first engine, after the train stopped following the accident, was 1277 feet.

On the morning of the accident when the weather was clear and dry Campbell stopped the school bus at the lines south of the spur track, opened the front door, listened and looked both ways for approaching trains, but saw and heard nothing indicating the approach of a train. From this position he had an unobstructed view of the tracks to the west for a distance of approximately 3120 feet.

As the school bus started up again after stopping, the crossing signals were not in operation. These signals, as previously indicated, were designed to give warning of an approaching train when it reached the signal switch 2250 feet to the west of the crossing. There was no evidence to show that the train was yet in sight as the bus first started moving onto the crossing. The bus proceeded slowly in second gear and crossed the spur tracks without difficulty. It was not moving faster than a person would walk, still in second gear with the motor pulling.

Campbell could not say definitely that he looked to the west while crossing the spur track, but he believed that he had done so. Other evidence indicated that the train was still not in

sight, and that the crossing signals had not yet started to operate. The motor continued to function properly as the bus crossed the spur track and the 26 feet between the spur track and the south rail of the eastbound track. Just as the front of the bus went onto the eastbound track the motor started to "buckle" and stalled. Campbell put the bus in neutral while it was still drifting slightly, and attempted to start the motor. It would not start. Although Campbell did nothing to stop the bus, it would not drift but lurched to a stop with the rear of the bus on the eastbound track and the front of the bus on the westbound track. He testified that he attempted to restart the engine, to drift the bus off the downgrade crossing, and to run the bus off with its starter, all to no avail. Under cross examination, he gave as a possible reason for the bus not being moved by the starter that the door was open which activated the flashing lights, which "take a lot of juice."

Campbell testified that he did not see the train coming until "after I felt something go wrong with the bus", and that when he saw it the motor had stopped but he was still drifting. At that time the train was "some distance to the west" but he was not sure how far. The front end of the train was around the curve, but he was unsure whether the whole train was. He could not remember seeing or hearing any signals at the crossing before he stalled. The two infant plaintiffs, and another child, who were on the bus testified that when the motor of the bus faltered they looked down the track and saw the headlight of the train coming around the bend, one of them saying he also saw the engine and two cars. When the motor of the bus would not start and the bus would not move off the track, Campbell, having become aware of the onrushing train, immediately started evacuating the children through the front door. He could not remember how he got out of the bus or what he did to rescue the children. The only evidence on this point was from other witnesses. One eyewitness testified to seeing Campbell run to the rear of the bus, attempt to flag the train, and then return to the front and rescue a fallen child an instant before the impact. Another eyewitness testified that Campbell was pulling children out of the front door of the bus and pushing them to safety.

The bus was a 1951 GMC, thirty-six passenger, school bus. It had a total length of 22 feet 5 inches, and a width of 8 feet. It was painted the official school bus orange, and bore the inscription "Garrett County School Bus." In addition to ordinary headlights and tail lights, the bus carried the regulation school bus flashing red lights which were located on each corner of the roof. The evidence shows that it had a front door on its right side, and also an emergency door at the rear which could be opened manually, either from the inside or from the outside. The emergency door was never opened at the time of the accident. The bus was powered with a six cylinder motor, and was equipped with a four speed transmission.

What caused the bus to stall was never determined. It had been inspected as late as August 18, 1959. The inspection disclosed no defects which could relate to the operation of the bus. On the day of the accident the bus had made several stops and starts without difficulty. There was no testimony that the bus had ever stalled before. Campbell admitted that he did not know why it stalled, nor did examination of it by the State Police or mechanics after the accident determine the cause.

The Diplomat stopped without incident at Terra Alta, then Oakland, and proceeded eastward toward the curve west of the crossing. The speed of the train was 48 to 50 miles an hour, which was the normal, authorized speed. When the train came out of the curve the fireman, Hollen, observed traffic moving at the crossing. Immediately thereafter, and while the engine went past the control which activates the signals at the crossing (2250 feet west of the crossing), and past the whistle post (1683 feet west of the crossing), where the engineer, Droege, said he blew the standard two longs, a short and a long, the attention of the fireman and engineer was drawn to observing first the home signal (1291 feet west of the crossing), and then the order board (591 feet 1 inch west of the crossing) to the side of the track. Both of these signals govern the movement of the train, and railroad operating rules require that both engineer and fireman look for them, and verbally confirm the signals to each other. When both

signals were found to be clear according to the engineer and fireman, they both practically at the same instant, looked to the crossing and noticed a vehicle appearing to foul the track. The engineer immediately put the train's brakes in full emergency operation, but the train was unable to stop before striking the bus, although tests after the accident indicated the brakes were working properly, and the court instructed the jury that there was no evidence to the contrary. It was agreed at the trial that the train came to rest with its head 1257 feet east of the center line of the crossing, its rear end being just east of certain dwarf signals which are 419 feet east of the west side of the crossing.

Nathan James Patton, father of one of the infant plaintiffs, testified that he was looking out the front window of a store at the corner of the crossing, saw the bus stall and immediately ran out on the porch of the building. He was conscious of no crossing signals when he looked out the window, but they were working when he reached the porch, a distance of about 14 feet from where he had been standing.

The witness, Edward Morris, a trackman for the Western Maryland Railway Company, testified that he was near the crossing and saw the bus moving slowly over it. Just as the bus reached the eastbound track it took two or three jerks and stalled, with the back end on the eastbound track when the crossing signals began to operate, and he heard the train. Since it is not disputed that the signals at the crossing worked properly when activated by the train, the effect of this testimony is to place the train about 2250 feet from the crossing at the time the bus stalled.

The engineer and the fireman both testified that after checking the home signal and order board and then seeing the bus, the engineer applied the brakes in the vicinity of the home signal, which is 1291 feet from the crossing. The conductor and flagman, who were further back in the train, testified that they felt an emergency application of the brakes, which they thought occurred somewhere west of the tower. The witness Shrout, a telegraph operator in the signal tower, testified that the train was in emergency as it went past the tower. Morris, who observed the train as it drew near the crossing, testified

that he knew it was braking because he saw blue smoke coming up from the wheels. There was uncontradicted evidence that as soon as the emergency brake lever is pulled sand is dumped from the engine to the rails to aid in slowing the train. A Maryland State trooper on the day of the accident observed and marked, and the next day actually measured deposits of light colored, unweathered sand on the rails from where the train stopped east of the crossing back to 1443 feet west of the crossing. At 1443 feet the sand was spread over a relatively wide area, narrowing as it got closer to the crossing. Since the sand, according to the testimony, was dumped from each of the three diesel units simultaneously, the inference is that the emergency brake was applied by the engineer in the lead unit when his cab was approximately 190 feet closer to the crossing than where the sand first appeared on the tracks. This would place the lead engine about 1250 feet from the crossing, when the sanding mechanism took effect.

Two expert witnesses for the B. & O. testified to the braking action of the train as shown by the engine's speed recorder. This is an automatic device, locked and inaccessible to the train crew, which constantly records the movement of the engine by means of a pencil or stylus making direct contact with a running tape. This tape indicated that the train had been traveling at 50 miles an hour when it was subjected to rapid deceleration in speed. Readings indicated that, with a possible margin of error of no more than 100 feet, the train went 2112 feet after the brakes began to take effect. Since the train stopped 1257 feet east of the crossing, this indicated that a recordable braking effort began 855 feet west of the crossing, plus or minus 100 feet. There was uncontradicted evidence that about 4 seconds must pass after the brake lever is applied before effective braking action begins. At 73 feet per second this would indicate the application of the brake lever by the engineer at a point about 1147 feet west of the crossing. With the addition of the 100 foot maximum margin of error, the distance would be 1247 feet. Thus, the evidence of the speed tape, the visual observations of the State trooper concerning the location of the sand, and the testimony of the

crew all indicated that the emergency brake was applied near the home signal. The speed tape indicated that the train had decelerated from 50 to 40 m.p.h. when it went over the crossing. The engineer, Droege, estimated his speed at the crossing to be 15—18 m.p.h. One of the B. & O. expert witnesses testified that the brake operation reaches maximum efficiency just before the train comes to rest.

Several eyewitnesses (among them Mason and Randall) testified for the plaintiffs and for the appellant Campbell, that they watched the train approaching the crossing and that it did not appear to be slowing down. They did not observe any sparks or other indications that the train was in emergency.

The testimony was conflicting as to whether or not the whistle was blown. The engineer testified that he began to blow the whistle at the whistle post (1683 feet west of the crossing) and other witnesses heard it, but this was contradicted by the testimony of Campbell and Randall, who said they did not hear a whistle blow.

Both appellants made motions for directed verdicts in their favor and for judgments n.o.v., which were denied. In passing upon motions for directed verdicts and judgments n.o.v. this Court has many times held that the evidence and all logical and reasonable inferences deducible therefrom must be considered in the light most favorable to the plaintiff's cause of action. This principle is too well established to require the citation of authorities.

We will first consider the contentions of Campbell and then those of B. & O. .

### CAMPBELL'S APPEAL

Campbell presents two questions:

I. Was the evidence legally sufficient to show any negligence on the part of the defendant Campbell, which was a proximate cause of the plaintiffs' injuries?

II. Did the trial court err in refusing to instruct the jury that compliance with Code (1957), Article 66½, § 241, required the defendant Campbell to make only one stop before driving over the Mt. Lake crossing?

## I

It is established law in this State that it is negligence *per se* for a person to attempt to cross railroad tracks without first looking and listening for approaching trains. Moreover, it is his obligation not only to look and listen before starting across the intersection but to keep on looking as he proceeds across. *Sears v. B. & O. Railroad,* 219 Md. 118, 124, 148 A. 2d 366, and cases therein cited; *Anderson v. Balto. & Ohio R. Co.,* 101 Md. 487, 61 Atl. 575. Whether proper care has been exercised under the circumstances is ordinarily a jury question. *Patapsco RR. Co. v. Bowers,* 213 Md. 78, 82, 129 A. 2d 802. The degree of care to be exercised by one whose automobile is stalled upon a railroad crossing is such care as a prudent man would exercise under the same or similar circumstances. *Pennsylvania R. Co. v. Simmons,* 159 Md. 114, 150 Atl. 263.

There was evidence from which the jury could have determined that Campbell went upon the eastbound track simultaneously with the beginning of the warning signal. If so, the train could have been seen by Campbell prior to his entry upon that track. Campbell stated that if he had seen it, although the alarm had not yet come on, he would not have crossed. He admitted that he knew that the main line was the real point of danger. The conclusion is not inescapable as argued in Campbell's brief, that the train was not in sight when Campbell got to the eastbound track. Whether Campbell may not have been held negligent as a matter of law in not stopping and looking before driving over the eastbound track (he said he was uncertain whether he did) is a far different matter from holding that the jury could not have found that he was negligent as a matter of fact in not looking. *Patapsco RR. Co. v. Bowers, supra;* and *Balto. & Ohio Railroad Co. v. State,* 190 Md. 227, 58 A. 2d 243.

Even if the train were not in sight, and a failure on the part of Campbell to look would not have borne any proximately causal relationship to the happening of the accident, the jury might have believed that Campbell could have heard three diesels a little over one-half of a mile away in open

country in time to have stopped the bus before it came to the eastbound track.

Campbell's actions after the bus stalled could have been found to have been negligent by the jury even when the emergency developed. *Newman v. Stocker,* 161 Md. 552, 157 Atl. 761. Campbell stated that he had tried to move the bus off with the starter. His efforts in that respect must have consumed valuable seconds when he was conscious of the peril. He was asked: "Q. Did the starter take effect at all? A. Well I feel it did. It took effect when I turned the motor over with it just the instant before I tried to pull it in gear. Q. Do you have any explanation why your starter wouldn't have pulled you the few feet off of that track downhill? A. By that time I had opened the door on the bus and that put the flasher lights on. * * * A. I was going to explain a little but I think we all know what those lights are, pretty big, and they take a lot of juice. * * * Q. And your explanation for the bus not starting, for the starter not taking the bus off that crossing, is that you opened the door and the lights came on and that ruined your power; is that it? A. That is."

The jury was entitled to give credence to Campbell's own explanation in the light of the attendant circumstances. He knew the operating characteristics of his own bus better than anyone else. Furthermore, the evidence shows that after Campbell had been unsuccessful in trying to move the bus off of the tracks by means of the starter, he got out of the front door of the bus, ran around to the rear and attempted to flag down the train. This must also have taken some seconds. He then returned to the front door of the bus and tried to pull some of the children out to safety. The jury may well have considered whether Campbell's actions at that time, and his failure to open the emergency rear door were compatible with his duty to exercise ordinary care and caution for the safety of his student passengers under the circumstances of the emergency. We think his actions or failure to act under the circumstances presented a jury question concerning Campbell's negligence as being a proximate and contributing cause of the accident, so that the court was not in error in denying

Campbell's motions for a directed verdict and for judgment n.o.v.

## II

The appellant Campbell claims that the trial court erred in failing to instruct the jury that the statute required Campbell to make only one stop before driving over the crossing. The record discloses that the only instruction given by the trial court to the jury concerning Campbell's duty to stop at the crossing was to read Code (1957), Article 66½, §§ 241 (a) and (b), which were applicable. This instruction was given at the request of Campbell. He now contends that some explanation should have been given by the trial court as to what constitutes a crossing. He argues that the instruction given, without more, was misleading in that it required Campbell to stop a second time as he proceeded across the crossing. We find no merit in this contention, because in the form requested this would ignore the decisional law of this State requiring the operator of the vehicle to use ordinary care continuously throughout the crossing. A reading of the statute which required a school bus to stop within 50 feet, but not less than 10 feet, of the crossing, and which constituted the instruction given below, was favorable to Campbell, for the evidence was undisputed that Campbell had stopped within 50 feet of the nearest rail and within 50 feet of the eastbound track.

## B. & O.'s APPEAL

B. & O. presents three questions:

I. Did the trial court err in refusing to grant this appellant's motions for a directed verdict and for judgment n.o.v.?

II. Did the trial court err in failing to adequately instruct the jury?

III. Did the trial court err in permitting the witness Auld to impeach the testimony of witness Shrout when no proper foundation was laid for such an impeachment?

## I

Much of what we have said with reference to Campbell's appeal applies with equal force to the contentions of B. & O. that there was no legally sufficient evidence or inferences

legitimately deducible therefrom which would support a jury's verdict favorable to the plaintiffs-appellees. Careful consideration of the record requires us to conclude that there was sufficient evidence tending to show negligence on the part of B. & O. which could have been a proximate cause of the accident and required submission of the question to the jury under proper instructions.

As to the B. & O. the trial court instructed the jury that if they should find that the school bus was stalled on the tracks at the crossing, it was the duty of the engineer and fireman operating the locomotive to use ordinary care in its operation and to keep proper look out for any obstructions on the tracks and when they discovered, or should have discovered, by the exercise of ordinary care, the perilous position of the school bus, it then became their duty to use all of the means at their command to prevent a collision between the train and the bus consistent with the safety of the train and its passengers, and if it should find from all of the evidence in the case that said employees failed in their duty, then its answer to the second issue of whether the B. & O. was guilty of negligence which directly contributed to cause the accident would be "yes."

As the train rounded the curve west of the Mt. Lake crossing where the farthest view was 3120 feet, it was clearly the duty of the railroad's employees to keep a proper lookout for traffic crossing the tracks at this public crossing and to become aware of any object as large as a school bus fouling the tracks in sufficient time to avoid colliding with it if there was sufficient distance between the train and the crossing at the instant when they saw, or should have seen, the bus in its stalled position. When the train came out of the curve 2700 feet west of the crossing at a speed of 48 to 50 miles an hour the fireman, Hollen, observed traffic moving at the crossing which he expected to clear the track in time to let the train cross. When the engine passed the control which activates the signals at the crossing (2250 feet west of the crossing), and passed the whistle post (1683 feet west of the crossing) where the engineer, Droege, said he blew his whistle, the attention of both the fireman and engineer was drawn to ob-

serving first the home signal (1291 feet west of the crossing), and then the order board (591 feet, 1 inch west of the crossing), to the side of the track. The railroad's operating rules required both the engineer and fireman to look for them and verbally confirm the signals to each other. When the signals were found to be clear, according to the engineer and fireman, they then, practically at the same instant, looked to the crossing, noticed a vehicle appearing to foul the track, and the engineer put the brakes in full emergency operation. Since the train came to rest with its head 1257 feet east of the center line of the crossing, and it required between 2548 and 2504 feet to stop the train with the brakes efficiently operating, the train had already passed the point where the accident could have been avoided when the brakes were applied, assuming that they were applied at the home signal, 1291 feet from the crossing, rather than when the order board was passed, 591 feet, 1 inch, from the crossing. In spite of the fact that the operating procedure of the railroad required the engineer and fireman to check the home signal and order board, the jury might well have considered whether these employees were negligent in failing to see the stalled bus from the end of the curve 2700 feet from the crossing, until they reached the home signal, 1291 feet from the crossing, or the order board, 591 feet, 1 inch from the crossing. The evidence was not clear as to just where the train was when the bus stalled but the witness Edward Morris for the B. & O., testified that the crossing lights came on just as the bus got to the eastbound track and that the bus drifted almost past this track before stoping. This was corroborated to some extent by the witness Patton, father of one of the infant plaintiffs, who, from the front window of a nearby store, saw the bus stall and who immediately came onto the porch of the store—a distance of about 14 feet—and found the crossing signals operating. Campbell testified the signals were not working as he went over the crossing. The crossing signals became active when the train was 2250 feet away.

The questions of time and distance involved in the evidence were for the proper consideration of the jury. Moreover, the jury might well have considered whether the railroad employ-

ees were negligent in not keeping a proper look out from the time the lead diesel rounded the curve until they had checked both the home signal and order board, which might have enabled them to stop the train short of the crossing had they become aware of the stalled bus earlier. Furthermore there was evidence from several witnesses to the effect that they noticed nothing unusual about the speed of the train or any blue smoke coming from the wheels, indicating that the brakes had been applied as the train was approaching the crossing from the control tower, 1291 feet west of the crossing.

In the case of *Pennsylvania R. Co. v. Simmons*, 159 Md. 114, 150 Atl. 263, the railroad appealed from a judgment in favor of a passenger in a stalled automobile which had been struck by the train at a public crossing. The "saw or should have seen" formula was contained in a prayer which was held to have been correctly granted over the contention of the railroad that there was no evidence that the train crew had "actual knowledge" of the plaintiffs' peril in time to have avoided the accident.

In *Miller v. Pennsylvania Railroad Company*, 272 F. 2d 545 (D. C. Cir. 1959), the Court applying Maryland law, reversed the judgment in favor of the railroad because, among other things, the trial court had instructed the jury "that the engineman had a right to assume plaintiffs' rig was moving and would clear the intersection before the train reached there.

In *Balto. & Ohio R. Co. v. Welch*, 114 Md. 536, 546, 80 Atl. 170, this Court held "that the duty of those in charge of moving railway trains to keep a look out for and exert care to avoid injuring persons at railway crossings and on public highways where such persons have a right to be and may be expected to be found, is entirely different from the care required of them in respect to the possible presence of trespassers on the railway tracks where, having no right to be, they are not expected to be found."

For a collection of cases concerning a stalled automobile on a railroad crossing see 21 A.L.R. 2d 742.

We think that the trial court was correct in denying B. & O.'s motion for directed verdict and for judgment n.o.v.

## II

Appellant B. & O. claims reversible error by the refusal of the trial court to grant certain requested prayers which in substance contained the argument urged upon us and rejected above. We think the instructions given by the trial judge fully and comprehensively cover the duties and responsibilities of the parties involved in this case. *Aleshire v. State,* 225 Md. 355, 170 A. 2d 758; *Lemons v. Chicken Processors,* 223 Md. 362, 164 A. 2d 703; *Lloyd v. Yellow Cab Co.,* 220 Md. 488, 154 A. 2d 906; and cf. *Ager v. Baltimore Transit Co.,* 213 Md. 414, 132 A. 2d 469.

## III

B. & O. finally contends that the trial court erred in permitting the witness Auld to impeach the testimony of witness Shrout in that no proper foundation had been laid for such impeachment.

In order to impeach a witness by proof of a prior contradictory statement a foundation for such impeachment must be laid, by asking the witness on cross examination whether he had made such contradictory statement to a designated person and apprising him of the time and place when the statement was supposed to have been made. *Moxley v. State,* 205 Md. 507, 109 A. 2d 370, and cases there cited. This gives the witness an opportunity to refresh his recollection and make such explanation as he may deem necessary and proper. *Moxley v. State, supra,* and *Brown v. State,* 72 Md. 468, 475, 20 Atl. 186, 188. However, if the witness denies he made the alleged statement he may then be contradicted by a witness who heard him make it, and the jury will determine what weight should be given his testimony. *Brown v. State, supra.*

In this case the witness sought to be impeached was fully apprised as to the time, place, and circumstances; he also stated that he read an account of his story as told by him to the impeaching witness, Auld, a newspaper reporter, and when asked whether it was correct replied: "It was not." No other questioning on cross examination along this line took place. Shrout was recalled and, in part, denied portions of the statement. He was given an opportunity to further explain the

inconsistencies between his first testimony at the trial and his story as published in the newspaper. Moreover, if appellant thought that Shrout did not explain enough this appellant could further have examined him when he was recalled as a witness. We find no merit in this contention of B. & O.

Since we think the case was properly submitted to the jury, under proper instructions, upon issues which entitled the jury to find that both defendants were concurrently guilty of acts or omissions amounting to negligence on the part of each defendant respectively, which were the concurrent proximate causes of the accident, the judgments will be affirmed.

*Judgments affirmed, with costs.*