FREDA THOMAS, Personal Representative
of the Estate of William Henry
Thomas et al. *v.* THE BALTIMORE
AND OHIO RAILROAD
COMPANY et al.

[No. 96, September Term, 1973.]

*Decided October 24, 1973.*

218

The cause was argued before ORTH, C. J., and MORTON and MOYLAN, JJ.

*John F. Somerville, Jr.*, for appellants.

*William H. Geppert* and *Robert S. Paye*, with whom were *Geppert, McMullen & Paye* on the brief, for appellees.

MORTON, J., delivered the opinion of the Court.

Freda Thomas, a fifty-three year old widow, brought suit against The Baltimore and Ohio Railroad Company and James Kostik, a locomotive engineer, alleging that their negligent conduct caused the death of her fifty-five year old husband, William Henry Thomas, who was killed almost instantly while attempting to drive his 20-ton dump truck across the Rock Cut Quarry railroad crossing near Corriganville in Allegany County, Maryland, as a result of being hit by an oncoming 94 car freight train being hauled by two diesel locomotives. At the conclusion of the entire case, Judge James S. Getty, who presided at the trial in the Circuit Court for Allegany County, directed a verdict in favor of The Baltimore and Ohio Railroad Company and the engineer of the train, James Kostik. In this appeal by Mrs. Thomas, the surviving spouse and personal representative of the deceased,[1] it is contended that the trial judge erred in finding, as a matter of law, that the railroad and the engineer were free of primary negligence; in finding that the deceased was guilty of contributory negligence; and in refusing to apply the doctrine of "last clear chance."

---

1. Pennsylvania National Insurance Company, the deceased's collision insurance carrier, also joined in the suit and this appeal.

The facts are relatively simple and not in substantial dispute. The point at which the main line tracks of the B. & O. Railroad cross Rock Cut Quarry road is known as the Rock Cut Quarry crossing. The road provides access from Maryland State Route 36 to a stone quarry, a coal yard and a number of houses. State Route 36 runs roughly east and west paralleling at that point the main line of the B. & O. Railroad which consisted of an eastbound and a westbound set of tracks. The highway is approximately 30 feet south of the B. & O. right-of-way and the gate at the entrance to the quarry and coal yard is approximately 78 feet north of the right-of-way. Shortly before 5:30 p.m. on December 7, 1970, the deceased delivered a load of coal to the yard and as he was driving over the crossing to return to Route 36 his dump truck was struck broadside on the passenger side, or right hand side, by the freight train. The truck was turned over so that the driver's side was flat on the tracks and was pushed some 1100 feet down the tracks before the train could be stopped. The truck caught fire as it caromed down the tracks and the cab became a holocaust which resulted in the almost instant death of the driver.

The head brakeman of the train testified that the train, consisting of 94 freight cars being hauled by twin diesel engines, was coming from Connellsville, Pennsylvania, on the eastbound tracks heading for Cumberland, Maryland. According to the brakeman: "It was cold, dark and clear." He testified that after passing over the crossing at Corriganville and rounding a turn, he had an unobstructed view of the Rock Cut Quarry crossing for a distance of some 1800 feet down a straight stretch of tracks. The brakeman tells the story as he saw it: "Just after we come around the curve and started down the straight line, I seen these headlights coming from the stone quarry, and I figured it was a truck or vehicle coming out of the stone quarry. And I made a comment to the engineer that the truck was coming out of the quarry. I guess five, ten seconds elapsed, and I said to the engineer again, I said, 'John,' I said, 'it don't look like that truck is going to stop.' And the next thing I knew it was the point of impact."

The brakeman stated that as they passed the Corriganville crossing and started making their approach to the Rock Cut Quarry crossing, the train was traveling at a speed of 25 miles per hour,[2] the engine bell was ringing, the dual sealed beam headlights of the engine were "on high beam" and "our engineer blowed the standard railroad crossing signal for the * * * [Rock Cut] Quarry crossing * * * two longs, a short and a long." He said the horn was still blowing at the time of the crash. When asked if the train's emergency braking system had been thrown into action, he said: "Yes, sir. * * * I would say a few seconds before impact or upon impact. Things was kind of exciting there for a few minutes." Upon further questioning, he stated that when he first mentioned to the engineer that "the truck was coming out of the quarry," the train was approximately 900 feet from the crossing and when he shouted to the engineer "it don't look like that truck is going to stop," the truck was on the westbound tracks and approaching the eastbound tracks upon which the train was traveling. He testified: "* * * I don't know what the man was thinking of at the time of the accident * * * he just more or less come out of there as if the railroad tracks weren't there."

The engineer confirmed the testimony of the brakeman that just prior to the accident the train was traveling at a speed of 25 miles per hour, the headlights were on high beam, the bell was ringing and he had given the appropriate crossing warning signal — "Two long blasts, a short blast and a long blast of the engine whistle" — which was "still being sounded at the time of the impact." He stated that his position in the locomotive cab was on the right while the brakeman sat on the left; and that because of the protruding "snub nose" of the locomotive, his vision to the left was limited as the train proceeded down the tracks. He explained that the crossing was in plain view until he got within about 75 feet and from that point to the crossing he could not see anything approaching from the left. He saw the truck for the first time as it was "crossing the westbound track onto my

---

2. The train's speed tape recorder apparently was not operating.

track." The train was approximately "sixty, seventy feet" away from the crossing. He activated the emergency brake system "about the time we made contact, possibly a second before or a second afterwards, or right at the time."

In contending that the railroad was guilty of primary negligence, the appellants point to the fact, conceded by the appellees, that it had not complied with the Maryland statute (Code, Art. 23, § 205) which requires a railroad "to erect at all points where its road shall cross any public road * * * a sign with large and distinct letters placed thereon, to give notice of the proximity of the railroad, and warn persons of the necessity of looking out for the cars; * * *." A representative of the B. & O. Railroad stated that the company had failed to comply with the statute because it was unaware that the access road to the quarry had been taken into the county roads system some years before and had ceased to be a private way where no grade crossing warning signs or signals are required. The statute further provides that "any company neglecting or refusing to erect such sign shall be liable in damages for all injuries occurring to persons or property from such neglect or refusal."

This statute was the subject of review over a half century ago in *Glick vs. Cumb. & W. Elec. Ry. Co.*, 124 Md. 308, a case strikingly similar, factually, to the case at bar. There, an automobile was struck by an electric railway car while being driven over an unposted railway crossing. There, as here, the driver had traversed the crossing shortly before the accident. In *Glick*, although the driver's view of the tracks was obscured by a car barn, he failed to stop but did look and listen. In the case at bar, the deceased's view was unobstructed, he clearly failed to stop and, apparently, did not look or listen. In *Glick*, as here, it was contended that the jury should have been permitted to determine whether the accident might not have been avoided had the railway company erected a warning sign as required by the statute. In disposing of this contention, the Court said, at 318:

"The evident purpose of that section [then Art. 23, Sec. 280, *Code* of 1912] was to provide for a

notice to persons using the public roads of the proximity of the railroad track, and thus warn them of the necessity of looking out for cars. Here the plaintiff and his chauffeur knew of the proximity of the railway track, and did look and listen for a car. Under such circumstances it would be impossible to attribute the accident to the failure of the defendant to erect a sign at the crossing, * * *."

Judge Getty, after finding that the deceased was familiar with the crossing, stated at the trial below: "* * * construing the evidence most favorable to the plaintiff, I am of the opinion that the proximate cause of this accident was not the failure to erect a sign based on the evidence here, but rather the failure of the deceased to stop and look and listen before entering upon the railroad track in exiting from an area where he had entered a short time previously." We are of the opinion that this holding is in accord with *Glick*. As pointed out by counsel for the appellees, *Glick* has not been reversed, modified or even mentioned by the Court of Appeals since its holding in 1914. Nor has the Legislature seen fit to amend the statute in any way since the holding in *Glick*. Contrary to the contention of the appellants, we think *Glick* represented sound law when decided and represents sound law today. In 65 Am. Jur. 2d *Railroads* § 557 (1972), it is stated: "The absence of a sign at or near a crossing for the purpose of indicating the crossing will not excuse the contributory negligence of a person injured at the crossing where such person knew of the crossing and could not have been misled by the absence of the sign." See also, 75 C.J.S. *Railroads* § 813 (1952) and 93 A.L.R. 218 (1934).

We cannot subscribe to the argument of appellants that in addition to the failure to erect a warning sign, there was other evidence of primary negligence on the part of the railroad and its agents. Both the engineer and brakeman testified, without contradiction, that the train was traveling at a speed of 25 miles per hour in a speed zone which authorized travel of 40 miles per hour; both headlights were

on high beam; the locomotive bell was ringing; the appropriate warning whistle was sounded; and the engineer and brakeman were maintaining a proper look-out. There was not a scintilla of evidence to support a finding that the railroad was guilty of primary negligence.

On the other hand, there was substantial evidence that the deceased was guilty of contributory negligence. The weight master at the Rock Cut quarry testified that he had known the deceased for a number of years; that the deceased was a self-employed hauler of stone and coal; that he had weighed the deceased's truck loaded with stone "a number of times"; and that he had observed the deceased use the Rock Cut Quarry crossing "as many as a dozen times" prior to the accident. While there was another crossing over the B. & O. tracks which could be used to reach the quarry and coal yard, it was very rough, barricaded by locked gates after working hours and used primarily by trucks hauling sand.

It is uncontradicted that the deceased traversed the Rock Cut Quarry crossing some ten to fifteen minutes prior to the accident for he had just delivered a load of coal to the coal yard. A witness who was following the deceased's truck out of the coal yard saw the crash. When the witness tried to use the other road to get across the tracks after the accident, he could not do so because the gate across the yard was locked. When asked: "Was there any way that Mr. Thomas could have gotten into the stone quarry other than using the Rock Cut road that night?", the witness replied: "No, sir."

The witness further testified that as he followed the deceased's truck out of the coal yard, he saw the train approaching the Rock Cut Quarry crossing, heard the train start "blowing the whistle about, oh, I guess a thousand, fifteen, maybe two thousand feet before they hit the crossing." He stated that the deceased's truck was going about ten miles per hour as it approached the crossing, "* * * I had seen the train coming. I didn't know what was going to happen. * * * But it seemed to appear that he didn't even stop, you know, he just slowed down more or less, took a glance or something, I don't know."

On the other hand, Mrs. Thomas, the widow, testified that she had accompanied her husband on hauling trips in the truck; that as far as she knew, he had only been to the Rock Cut quarry once before the accident; and that he had lost an eye in a mining accident many years ago which made him a particularly cautious driver who had no record of traffic violations.

Appellants seek to exonerate the deceased from guilt of contributory negligence by asserting that it was dark; that he may have been confused by headlights of automobiles traveling on Route 36; and that he might have been "depending on a warning sign to give him notice." We think these arguments amount to no more than clutching at imaginary straws. The evidence pointing to the deceased's prior familiarity with the Rock Cut Quarry crossing was overwhelming and completely compelling.

Md. Code, Art. 66½, § 11-701, provides in part:

> "(a) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of the vehicle shall stop within 50 feet but not less than 15 feet from the nearest rail of the railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
>
> * * *
>
> (3) A railroad train approaching within approximately 1,500 feet of the highway crossing emits a signal audible from that distance and the railroad train, by reason of its speed or nearness to the crossing, is an immediate hazard; or
>
> (4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing."

In addition to the obligation imposed by the above statute, it is the well established decisional law of this State "that it is negligence *per se* for a person to attempt to cross railroad tracks without first looking and listening for approaching

trains. Moreover, it is his obligation not only to look and listen before starting across the intersection but to keep on looking as he proceeds across." *Campbell v. Patton,* 227 Md. 125, 135; *Sears v. B. & O. R. R.,* 219 Md. 118. We think the evidence demonstrates with crystal clearness that the deceased failed to comply with the admonitions of the statute and the decisional law of this State; that had he done so he would have both seen and heard the oncoming train as did others in the vicinity of the crossing; and that the proximate cause of the tragic accident was the deceased's own negligence.

Finally, we cannot agree that the factual posture of the case at bar lends itself, as contended by appellants, to the application of the doctrine of last clear chance. The classic statement of the doctrine was set forth in *Mackenzie v. Reesey,* 235 Md. 381, and has been adhered to since by the Court of Appeals and this Court (see *Smiley v. Atkinson,* 265 Md. 129; *Smiley v. Atkinson,* 12 Md. App. 543). In *Mackenzie,* it was said, at 387:

> "The doctrine presupposes primary negligence on the part of a defendant, contributory negligence on the part of a plaintiff, and a showing of something new or independent, which affords the defendant a fresh opportunity (of which he fails to avail himself) to avert the consequences of his original negligence and the plaintiff's contributory negligence."

Having found as a matter of law that the appellees were free of primary negligence, it is apparent that an element essential and necessary to the invocation of the doctrine of last clear chance is lacking and, thus, the doctrine has no application here. Even assuming primary negligence on the part of the appellees, there was no showing of any new or independent factor which would have afforded appellees a fresh opportunity to avert the original negligence and the decedent's contributory negligence. *Sears, supra,* and *Mehring v. Pennsylvania Railroad,* 158 Md. 310.

*Judgments affirmed; costs to be paid by appellants.*