569 A.2d 1254

**Kirk BRUCE**

v.

**STATE of Maryland.**

**No. 58, Sept. Term, 1989.**

Court of Appeals of Maryland.

Feb. 27, 1990.

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, Nancy S. Forster, Asst. Public Defender, on brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Mary Ellen Barbera, Asst. Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and CHASANOW,* JJ.

CHASANOW, Judge.

Appellant, Kirk Bruce, was convicted by a jury of five counts of murder, six counts of use of a handgun in the commission of a felony, one count of attempted murder, one count of assault with intent to murder, one count of conspiracy to rob, and one count of conspiracy to commit murder. The day after the trial, a sentencing hearing commenced before the same jury.

---

* Howard S. Chasanow, a judge of the Seventh Judicial Circuit, was specially assigned to the Court of Appeals at the time the case was argued. He was sworn in as a judge of the Court on 17 January 1990.

Appellant was found to be a principal in the first degree in the murders of two of the victims, and the jury returned a sentence of death for each of those murders. For the remaining counts, the trial judge sentenced Appellant to three life sentences without the possibility of parole, one life sentence, six sentences of twenty years, and one ten year sentence. All sentences were to be served consecutively.

Appellant filed a notice of appeal to this Court pursuant to Maryland Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.) Article 27, § 414 and Maryland Rule 8–301. Appellant does not challenge the sufficiency of the evidence, but for the purpose of our analysis, we must summarize some of the evidence introduced at trial.

Colleen Grady (Ms. Grady) was with Appellant on January 22, 1988. Ms. Grady overheard part of a telephone conversation while Appellant was talking to Ian Henry (Henry). In the conversation, Appellant mentioned two briefcases of money, "the Village in the Woods," "Chief," and "Donny." During the conversation Ms. Grady observed Appellant point his finger and exclaim "I will kill him. Boom! Boom!"

Several hours after this conversation occurred, police responded to a call of a shooting and entered an apartment at the Village in the Woods apartment complex in Landover, Maryland. There they found five dead bodies. The body of Leonard Francis, also known as "Chief," was found next to his wheel chair in the dining room. Chief had three gunshot wounds including one execution style wound to the side of his head. Lloyd Chambers, also known as "Donny," was found in the kitchen dead as a result of six gunshot wounds including one in the back of the head. Next to Donny was the body of Everton Mitchell, who died as the result of a gunshot wound to the back of the head. In a back bedroom, police found the bodies of Carlene Hamilton, also known as "Donna," with a gunshot wound to the top of her head, and Richard Williams, also known as "Ritchie," with eight gunshot wounds including one to the head.

Police officers were met by Charmaine Chambers (Ms. Chambers) who had been shot twice in the head, but was still alive.

Ms. Chambers survived and was a witness for the State at Appellant's trial. Ms. Chambers testified that she went to the apartment in the Village in the Woods to visit her friend Donna. She knocked, and the door was answered by Carl Dunstrom, also known as "Fabulous." Chief, who was in his wheelchair inside the apartment, instructed Fabulous to allow Ms. Chambers to enter. Once inside she saw Appellant, whom she had met before, and several other men. One of the men, Henry, was on the telephone. When Henry hung up, he produced a gun and grabbed Ritchie. Appellant got up from his chair with a gun in his hand, grabbed Chief from his wheelchair, and removed a second gun from Chief's wheelchair. Fabulous was also armed with a weapon. Ms. Chambers then ran into a back bedroom where Donna was asleep. Ms. Chambers heard shots and saw Ritchie run into the bedroom. He was being pursued and shot at by Henry. Donna woke up, and she and Ms. Chambers tried to slide under the bed. More shots were fired, and Ms. Chambers heard Donna groan. Henry then approached Ms. Chambers, grabbed her by the hair, and fired a shot at her head. Ms. Chambers lay on the floor and tried to appear dead while the gunshots continued. Fabulous then came into the bedroom, grabbed Ms. Chambers by the hair, and shot her again. The shooting stopped, and some time passed. Ms. Chambers crawled out of the apartment and went to a neighboring apartment to summon police and an ambulance.

Jacqueline Sellers (Ms. Sellers), the girlfriend of Fabulous, was called as a State's witness. She testified that on January 22, 1988, while the soap operas were on, she was in an apartment with Appellant, Henry, Fabulous, Eddie Bell (Eddie), and Appellant's girlfriend, Michelle Nelson (Ms. Nelson). The men left while the soap operas were still on. Sometime after 7:00 p.m. Eddie came to the door. As a result of the conversation with Eddie, Ms. Sellers and Ms.

Nelson gathered up their clothes, as well as the clothes of Fabulous and Appellant, and took them downstairs to the parking lot. They waited in the parking lot, and eventually Appellant, Fabulous, and Henry drove up. Ms. Sellers, Fabulous, and Henry got into one car; and Eddie, Ms. Nelson, and Appellant got into another car. They all drove to Virginia. During the trip both cars pulled into a gas station. Henry got out of the car, went over and talked with Appellant, and returned to the car with some guns. There were four guns in the car which Ms. Sellers was told to cover with her coat. Ultimately, the six people checked into three adjacent rooms in a hotel somewhere in Virginia. At the hotel Ms. Sellers saw that all four men had blood on their clothes. The men removed their bloody clothes and put them in a trash bag, which they dumped somewhere. The group watched television at the hotel, and when a news broadcast reported the murders in a Landover apartment, Appellant, Fabulous, Henry, and Eddie began "dancing ... parading around shooting boom, boom, boom" with their fingers. The group stayed in Virginia for about a week, then went to Florida.

While in Florida, the group changed hotels two or three times, and during that time, Ms. Sellers was able to observe that a briefcase the men had with them was filled with money. The group then split up and separately traveled to New York. Ms. Sellers was with Fabulous when he was arrested in New York. Approximately one month after Fabulous was arrested, Ms. Sellers received a call from Appellant who wanted to know whether the police had been to Ms. Sellers' house. Ms. Sellers told Appellant that the police had not been to her house and was told by Appellant that if he found out she was lying, she would be dead.

Prince George's County Police Detective Howard Shook testified that Appellant was arrested in New York, and that on April 16, 1988, he went to New York to interview Appellant. After being informed of his right to remain silent, Appellant agreed to talk to Detective Shook. Appellant was asked if he had seen a reenactment of the crime on

the television show "America's Most Wanted." Appellant responded that he had and that it was "pretty close" to being correct. Detective Shook told Appellant that he knew Appellant had taken Chief's gun from under Chief's legs. Appellant said that the gun was taken from a pouch on the back of Chief's wheelchair.

Robert Williams, the brother of the victim Ritchie, testified that he worked for the drug organization run by Chief, and that Chief kept money in two briefcases. He further testified that he had seen one of the briefcases in Chief's apartment the day of the shootings. Federal Bureau of Investigation Agent Gerald Wilkes testified that he performed ballistic tests on some of the weapons, shells, and projectiles, which were recovered and admitted into evidence. Other evidence introduced by the State supported the jury's findings of guilt.

Appellant was the first defense witness to testify. He testified that he, the victims, and the co-defendants were in the drug business together. He admitted being in the apartment on January 22nd, but he maintained that he fell asleep and woke up when an argument began; when shots were fired, he ran out the front door and ran to his car. He drove to his girlfriend Michelle Nelson's apartment, but he got lost on the way. When he ultimately arrived at the parking lot at his girlfriend's, Henry, Fabulous, and Eddie were already there. The four men, Ms. Sellers, and Ms. Nelson then drove to Virginia, and from there left on a pre-planned trip to Florida. Appellant testified he stayed in Florida for about four days, and then went to New York City.

Additional facts relevant to the disposition of this appeal will be presented in the course of the opinion.

## I. *Security Measures*

The first contention Appellant makes on appeal is that the trial court erred in permitting extraordinary security measures, in the absence of evidence or findings of fact on the

record, justifying those measures. He maintains that those security measures prejudiced him with the jury.

The record discloses that there was enhanced security during this trial. Armed guards were around and on the roof of the courthouse, new sets of metal detectors were utilized, and a deputy sheriff was posted in close physical proximity to Appellant.

We begin our analysis by first noting there are three types of security measures that we must address: first, security measures taken in the courtroom or around Appellant in the view of the jury; second, security measures taken outside the courtroom not in close proximity to Appellant which were observed or observable by the jury panel; and third, security measures taken outside the courtroom which were not observed or observable by the jury panel.

Custodial officials should be free to employ any reasonable restraints and security measures they think are necessary while transporting an incarcerated person to and from court, and as long as such measures are out of sight of the jury or the jury panel, they are ordinarily of no concern to the trial court. Security measures that are not observed or observable by the jury generally do not offend due process rights to a fair trial, and do not require judicial scrutiny. Ordinarily, in order to establish that trial due process rights were violated by excessive security measures, the defendant must first establish that the security measures were observed or observable by jurors or prospective jurors.

When Appellant's case was called for trial in Charles County, after the case had been removed from Prince George's County, defense counsel complained about the security measures in and around the courthouse. The security measures outside the courtroom to which defense counsel objected were the metal detectors, armed guards on the roof of the courthouse, and additional deputies, some dressed in camouflage fatigues with flak jackets and automatic weapons. In response to this complaint, the Assistant State's Attorney indicated:

With respect to the comments on security, Your Honor, [we] would only indicate that today we have two metal detectors. There were no sheriffs outside this morning that I saw with any weapons displayed. It was very low key. In this courtroom today we have two deputies without a uniform and one uniformed deputy in the courtroom.

We believe that the security arrangements are fair and reasonable given the nature of the crime itself; given the threats that we believe were made against witnesses, and [defense counsel] is aware of this because he has been provided with Grand Jury testimony that detailed the threats that were made to a witness by the name of Jacqueline Sellers; the fact that one of the perpetrators is allegedly still at large in this case; the fact that the defendant is under indictment in Miami for charges that carry a punishment of up to a life imprisonment.

He is facing the death penalty in Maryland. He is facing life imprisonment in Miami which gives substantial incentive to flee this jurisdiction.

After the jury was selected and pre-trial motions were heard, defense counsel again raised the issue of excessive security outside the courtroom. The specific complaints were:

Every time I walk out of the courthouse, I am confronted with two sharpshooters with what appear to be automatic weapons, binoculars, earphones, flak jackets on top of the courthouse. Every time I pull in in the morning at 8:30, I'm confronted with a SWAT team in fatigues, Your Honor, with flak jackets, with automatic machine guns.

There are metal detectors that have recently been put in this courthouse expressly for the purposes of this trial. Not only one downstairs, Your Honor, there's one outside of our door. The jury is seeing this, Your Honor. The fact that you have decided to sequester them is not helping it. They come in under those guns.

In response to defense counsel's observation, the trial judge informed counsel that he had spoken to Major Tolson,

who apparently was in charge of security, and Major Tolson assured the judge that "the jury will not see any of what you have described during their time in this courthouse."

■ The issue of security outside the courtroom was brought up one final time when defense counsel attempted to introduce their own videotape recording of the security measures. No relief was requested at this juncture. Rather, counsel sought merely to make the videotape part of the record. Counsel did not proffer, and the videotape does not establish that the security measures it portrays were ever witnessed by the sequestered jury. The security precautions portrayed on the videotape cannot be the basis for any due process violation since Appellant failed to make any threshold showing that such measures were observed or observable by the jury. Any security precautions in the vicinity of the courtroom, or even surrounding a criminal defendant, which are not observed or observable by the jury panel, ordinarily do not have a prejudicial effect on the right to a fair trial. If the jury is not aware of the security measures, it cannot be prejudiced by them.

It is obvious that some security is necessary or desirable in most, if not all, criminal trials. It is equally obvious that not all security measures will result in prejudice to the defendant. Security measures outside the courtroom not in close proximity to the accused are far less likely to have a prejudicial effect than security measures within the courtroom and/or surrounding the person on trial, as the Supreme Court observed in *Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986):

The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as

easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. *See Hardee v. Kuhlman*, 581 F.2d 330, 332 (CA2 1978).

*Holbrook* 475 U.S. at 569, 106 S.Ct. at 1346, 89 L.Ed.2d at 534–35.

■ In the instant case, the jury was aware that one or more of the victims, as well as one or more of the perpetrators, carried guns and were involved in large scale drug dealing. Retaliation or further violence was cause for concern. Not all of the people responsible for the multiple murders were being tried, or were even apprehended. Reasonable safety precautions to safeguard witnesses were warranted. The inferences to be drawn from the security measures outside the courtroom were not necessarily that the defendant was dangerous or untrustworthy, but could be that there was a potential for violence directed at the defendant or the witnesses in the case.

In order to establish that these security measures outside the courtroom, not in close proximity to Appellant, prejudiced Appellant's right to a fair trial, he would have to establish that "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook* at 572, 106 S.Ct. at 1347, 89 L.Ed.2d at 535, citing *Estelle v. Williams*, 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126, 131 (1976), *reh'g denied*, 426 U.S. 954, 96 S.Ct. 3182, 49 L.Ed.2d 1194 (1976). We conclude that Appellant failed to establish any unacceptable risk of prejudice from the limited descrip-

tion, on the record, of the security forces deployed in, around, and on top of the courthouse.

■ Appellant next complains about security measures taken in and adjacent to the courtroom. Prior to jury selection, defense counsel objected to the single deputy sheriff stationed close to Appellant and requested that the deputy be required to stay on the other side of the rail. The trial judge first determined that the deputy could not overhear any conversations at the trial table. The deputy sheriff also indicated that, if he were separated from Appellant by a rail, a security risk would be posed. We believe permitting a single deputy sheriff to remain on the same side of the rail as the defendant, after ascertaining that the deputy could not overhear any conversations at the trial table, was a proper exercise of discretion.

A short time later Appellant's counsel again raised the issue of security in the courtroom. Defense counsel pointed out that "I am counting at least four marshals that are in suits, plain clothes, in the courtroom, in addition to approximately two bailiffs that are in the courtroom."

After the jury was selected and pre-trial motions were heard, Appellant again raised the issue of security. The complaints of courtroom security in close proximity to the defendant involved the presence of a uniformed sheriff's deputy in the courtroom and a bailiff. Counsel at that time did candidly acknowledge to the trial judge that "if we just were to limit it to this courtroom, what's going on in this courtroom right now, Your Honor, I would be the first one to admit that we would lose on appeal on this issue...." Counsel was correct.

■ The issue of courtroom security arose a final time when handcuffs were being removed from Appellant as the jury was being led into the courtroom. This viewing of Appellant in handcuffs by the jury was clearly inadvertent. No cautionary instruction was requested, and no motion for mistrial was made. Instead, defense counsel merely asked the court to instruct the deputies to make sure that such an

incident did not recur. The trial judge agreed to so instruct the courtroom personnel. This one inadvertent viewing of Appellant in handcuffs clearly did not require the trial judge to take any action *sua sponte,* and did not result in any prejudice to defendant's right to a fair trial. *See Bowers v. State,* 306 Md. 120, 129 n. 2, 507 A.2d 1072, 1076 n. 2, *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986), citing *Dixon v. State,* 27 Md.App. 443, 451–52, 340 A.2d 396, 401, *cert. denied,* 276 Md. 741 (1975).

■ The determination of whether courtroom security measures violate a defendant's due process rights must be made upon a case-by-case basis. In *Holbrook,* the Supreme Court made it clear that the role of a reviewing court is to,

look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

*Id.* at 475 U.S. 560, 572, 106 S.Ct. at 1347–48, 89 L.Ed.2d at 537.

In the instant case we are not confronted with an inherently prejudicial practice like shackling during trial, which can only be justified by compelling state interests in the specific case. *Id.* at 568–69, 106 S.Ct. at 1345–46, 89 L.Ed.2d at 534. We are also not confronted with an extensive security force so close to the defendant that it could "create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." *Kennedy v. Cardwell,* 487 F.2d 101, 108 (6th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974).

The courtroom security measures in this case were not unreasonable. Our inquiry is not whether less conspicuous measures might have been feasible, but whether the measures utilized were reasonable and whether, given the need, such security posed an unacceptable risk of prejudice to the defendant. *Holbrook* 475 U.S. at 572, 106 S.Ct. at 1347, 89

L.Ed.2d at 536. We find nothing in the record to indicate an unacceptable risk of prejudice in the security measures to which the jury panel may have been exposed, and therefore, we hold that the trial judge did not abuse his discretion in permitting the courtroom security utilized in the instant case.

## II. *Failure to Properly Exercise Discretion*

■ Appellant's next contention is that "the trial court erred in consistently denying defense motions without making necessary findings of fact and without exercising discretion." Appellant asserts that the trial court "was in a tremendous hurry to get the case over with," and contends that the trial judge made his rulings in a summary fashion without exercising proper discretion.

The jury was sequestered throughout the two week trial and sentencing, so the trial court's desire to expedite the trial was justified. Indeed, Appellant's complaint on appeal is not with the pace of the trial, but with the court's "series of snap rulings totally devoid of legal or factual support."

As will be discussed in the balance of this opinion, none of the challenged trial rulings constituted reversible error. While it might have been a better practice to do so, it was not necessary for the trial judge to state for the record his preliminary fact findings or underlying reasons for those rulings.

## III. *Second Request for Removal*

■ This case originated in Prince George's County, and on the first scheduled trial date a defense suggestion for removal was filed. Maryland Rule 4–254(b)(1). The case was removed to Charles County. When the case was called for trial in Charles County three days later, the defense made a second request for removal, citing extensive publicity surrounding the case. The trial judge heard the arguments of counsel and denied the second request for removal. Although the judge did not articulate his reasons for denial, it is clear that he understood the basis for the motion, and that he was exercising his discretion in denying

the motion. While there was a good deal of publicity surrounding the crime and the trial, the defense failed to show that publicity in the Charles County community would have prevented Appellant from getting a fair trial. Further, a review of the individual *voir dire* contained in the record shows that all jurors who may have been prejudiced by pretrial publicity were excused for cause.

IV. *Discovery Requests for "Statements" by Witnesses*

On cross-examination of Charmaine Chambers, it was established that she was interviewed by Prince George's County Police Officers, who took notes of the questions they asked and the answers she gave. Defense counsel notified the court that he had never been given those police officers' notes and made a motion to strike Ms. Chambers' testimony and a motion for mistrial. Both of these motions were denied.

Robert Williams testified on cross-examination that he was interviewed by a Prince George's County Detective for "many hours." The detective took notes of the questions and answers. After the interview, the witness may have reviewed and approved portions of the detective's notes "in certain areas," but did not read, sign, or otherwise adopt or approve all of the detective's notes of the interview.

Kenneth Clee, a State's rebuttal witness, testified on cross-examination that he spoke to New York City Police. The Assistant State's Attorney indicated that he had no information about any statements given by Kenneth Clee to New York City Police Officers.

A fourth State's witness, Jacqueline Sellers, apparently gave one or more written statements to New York authorities, but the Assistant State's Attorney had no knowledge of any statement by Jacqueline Sellers given to the New York Police Officers. Upon commencing cross-examination of the witnesses, defense counsel requested that the State provide, or at least that he have a recess to secure, the officer's notes of the interviews of Charmaine Chambers,

Robert Williams, and Kenneth Clee, as well as the written statement of Jacqueline Sellers. Defense counsel's requests were refused by the trial judge.

We note that in determining what "statements" must be turned over by a prosecutor after a witness has testified on direct examination, the Jencks Act, 18 U.S.C., § 3500 (1985) is instructive. *Carr v. State*, 284 Md. 455, 460–61, 397 A.2d 606, 608–09 (1979). *See also State v. Leonard*, 290 Md. 295, 429 A.2d 538 (1981), affirming *Leonard v. State*, 46 Md. App. 631, 638–39, 421 A.2d 85, 88–89 (1980). The Jencks Act provides in part:

> (e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
>
> > (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
> >
> > (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement ...

The testimony elicited by Appellant's counsel did not require the trial judge to find, and he did not find, that any of the notes of the officers were either substantially verbatim and contemporaneously recorded, or signed, or adopted, or otherwise approved by the witnesses. Charmaine Chambers never reviewed the police officer's notes of her interview. Robert Williams only reviewed portions of the officer's notes "in certain areas." He was never asked what portions of the notes he reviewed or what subjects were encompassed in his partial review of the notes. The officer's notes of Ms. Chambers' interview were properly held not to be a discoverable "statement" under the Jencks Act as they were not "signed or otherwise adopted or approved" by her. Mr. Williams' review and approval of only indefinite portions of the officer's notes are not sufficient to make the notes in their entirety a discoverable "statement." *See United States v. Hogan*, 763 F.2d 697, 704 (5th Cir.

1985) (where the witness neither signed, read, nor heard the notes in their entirety, the notes failed to qualify as a statement under subsection (e)(1) of the Jencks Act); *see also United States v. Newman,* 849 F.2d 156, 160 (5th Cir.1988).

■■■■■ The essential purpose for requiring disclosure of statements is to permit the defense an opportunity to impeach the witnesses through these prior statements. *United States v. O'Malley,* 796 F.2d 891, 900 (7th Cir.1986). Given this purpose, it is obvious that a witness could not be impeached with the police officer's notes which were never adopted or approved by the witness. *Collins v. State,* 318 Md. 269, 287–89, 568 A.2d 1, 10 (1990). We point out, however, that if the State is aware of prior inconsistent statements made by a witness to a police officer, it may have an obligation to produce this information under the duty to furnish exculpatory evidence. Maryland Rule 4–263(a)(1).

■■■■ With respect to Jacqueline Sellers, who apparently wrote out one or more statements, and Kenneth Clee, who gave statements to New York City Police Officers, Appellant does not contest the fact that the prosecutor in Maryland had no knowledge of those statements. Statements made by a criminal defendant to agents of states other than Maryland are generally discoverable. *See Bailey v. State,* 303 Md. 650, 496 A.2d 665 (1985). "Statements" by witnesses which must be furnished by the State at the conclusion of direct examination, are governed by different considerations. *Carr* 284 Md. at 460–61, 397 A.2d at 608–09; *Leonard* 46 Md.App. at 638–39, 421 A.2d at 88–89. The discovery rules make no provision for witness statements to be turned over unless exculpatory. The requirement that the State furnish witness statements is spelled out in *Carr* and *Leonard, supra.*

We first note that the Jencks Act requires production of "statements of a witness in the possession of the United States." 18 U.S.C. § 3500(a). We further note that several decisions have held that for the purposes of the Jencks Act, "statements" in possession of the state authorities are not

"in possession of the United States." *See, e.g., United States v. Cagnina,* 697 F.2d 915, 922 (11th Cir.1983), *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983); *United States v. Bermudez,* 526 F.2d 89, 100 n. 9 (2nd Cir.1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976); *Beavers v. United States,* 351 F.2d 507, 509 (9th Cir.1965). Where, as here, the state's attorney was not in possession of, and was not aware of, statements made by a witness to agents of another state, there is no requirement that the trial be suspended or aborted so that those statements can be secured by defense counsel. For the reasons indicated, we hold that the trial judge did not err in refusing to require the State to produce and turn over the officers' notes and the statement of Jacqueline Sellers.

V. *Discovery of Medical Records of State's Witnesses*

■ During cross-examination of Charmaine Chambers, who had been shot in the head, defense counsel established that Ms. Chambers had been under the care of a physician because of her wounds and because she was pregnant. Ms. Chambers also indicated that she experienced some memory problems when she testified before the Grand Jury because her doctor had told her to put the incident out of her mind. At the conclusion of cross-examination, defense counsel made a motion to subpoena Ms. Chambers' physicians and all medical records. This motion was denied.[1] The court is not obliged to assist counsel in conducting a fishing expedition during the trial. Without a far greater showing of the existence of pertinent information and the need for judicial intervention, the defense requests were properly denied.

VI. *Ruling on Scope of Cross-Examination*

■ The State called as an expert witness F.B.I. agent Gerald Wilkes to testify about specific ballistic test results.

---

1. It is clear from the record that the State possessed no psychiatric records relating to this witness. As a result, no claim under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), can be sustained. *Jones v. State,* 310 Md. 569, 587, 530 A.2d 743, 752 (1987).

On cross-examination, defense counsel sought to elicit testimony about ballistic test results of another weapon apparently recovered from a co-defendant, Henry. That weapon had not been previously mentioned, and was not in evidence.

In *Thomas v. State*, 301 Md. 294, 308, 483 A.2d 6, 13 (1984), we recognized that "[i]t is well accepted that cross-examination ordinarily may only be used to explore the subject matter covered by the witness in his direct examination and for impeachment purposes." The testimony sought to be elicited clearly goes beyond the scope of direct examination. To the extent that the co-defendant's involvement may have been relevant to the defense, Appellant was required to develop the matter during his own case, and not during cross-examination of the State's witness.

■■■ During cross-examination of Robert Williams, defense counsel elicited from the witness that on January 24, 1988 he had been charged with four handgun offenses, three counts of carrying a handgun, and one count of alteration and removing a manufacturer's serial number on a firearm. It was also established that the handguns were a Smith and Wesson .38 caliber special, a Taurus .9 millimeter pistol, and an Interdynamic .9 millimeter semi-automatic pistol with the manufacturer's serial number altered and removed. In return for his testimony in the instant case, the State had agreed to drop all four of the weapon counts against Robert Williams. During cross-examination, Appellant tried to introduce a photograph of one of the weapons the witness had been charged with possessing. The State objected and the objection was sustained.

Wide latitude must be given a cross-examiner in exploring a witness' bias or motivation in testifying. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). A permissible purpose of such cross-examination is "to show ... that [the witness'] testimony was biased because given under promise of expectation of immunity, or under the coercive effect of his detention...." *Alford v. United States*, 282 U.S. 687, 693, 51 S.Ct. 218, 220, 75 L.Ed. 624,

628 (1931). In the instant case Appellant was able to and did explore in some detail the nature of the charges that were being dropped in return for Mr. Williams' testimony, as well as a description of the firearms he possessed. The failure to allow into evidence a photograph of one of the weapons found in Williams' possession did not prejudice Appellant and, therefore, if it was error at all, it was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

## VII. *Rebuttal Testimony*

 In his testimony Appellant admitted being in the apartment when the shooting began, but denied taking part in the shootings. Appellant also testified that pursuant to plans he and Ms. Nelson had made prior to the events of January 22, the two of them flew to Florida. Appellant returned to New York after spending four days in Florida.

During cross-examination, the prosecutor established that Appellant knew Kenneth Clee from New York. Appellant was then asked if, while he was in New York City, he told a man named Kenneth Clee that he (Appellant) was "on the run from the F.B.I." because of some killings in Maryland. Appellant denied this.

After the defense rested its case, the prosecutor asked to call a rebuttal witness, Kenneth Clee. Over objection, Clee was permitted to testify that in March or April of 1988, he had a conversation with Appellant in New York, and during that conversation Appellant admitted that "he had killed a couple of people in Maryland, and that he was wanted by the F.B.I."

 Appellant claims that the trial judge erred in admitting Clee's testimony as rebuttal evidence. Appellant's admissions to Clee that he was fleeing from the F.B.I. and had killed a couple of people in Maryland could have been introduced as substantive evidence in the State's case in chief. They constitute admissions of flight and admissions of criminal agency. Instead of offering these statements as part of its case, the State waited, and when Appellant took

the witness stand and denied participation in any killings and testified that the trip to Florida was pre-planned, the State attempted to impeach this testimony through the prior inconsistent statements made to Clee. When Appellant denied making the statements to Clee,[2] the State quite properly, in rebuttal, offered the prior inconsistent statement through Clee. We note that Appellant's statement when offered in rebuttal was not admissible at that stage as an admission, but was admissible at that stage as a prior inconsistent statement to impeach Appellant's testimony. Appellant could have requested a limiting instruction that the prior inconsistent statement was admissible only to impeach Appellant's testimony, and not as substantive evidence, but he did not do so, and the trial judge ordinarily is not required to give a limiting instruction in the absence of a request. *See Mulcahy v. State,* 221 Md. 413, 158 A.2d 80 (1960). *See also Tinnen v. State,* 67 Md.App. 93, 100–01, 506 A.2d 656, 659–60 (1986).

## VIII. *State's Closing Argument*

During the trial several references were made to Appellant's girlfriend, Michelle Nelson. Appellant testified to meeting Ms. Nelson and traveling with her to Virginia and then to Florida. Appellant denied hearing any television reports of the killings while he and Ms. Nelson were in Virginia or dancing and pretending to shoot in the air upon hearing the news broadcast. He also testified that his trip to Florida with Ms. Nelson had been planned before the shootings occurred. Appellant did not call Ms. Nelson to corroborate any of his testimony.

---

**2.** Before a prior inconsistent statement may be introduced, the witness must be informed of the time and place the statement was made, as well as the substance of the statement. *State v. Kidd,* 281 Md. 32, 46 n. 8, 375 A.2d 1105, 1114 n. 8 (1977); *Campbell v. Patton,* 227 Md. 125, 141, 175 A.2d 761, 770 (1961). This is to enable the witness to refresh recollection, as well as to give the witness an opportunity to offer an explanation for the statement. The foundation was laid, although just barely, during cross-examination of Appellant.

In his closing argument to the jury at the guilt or innocence phase of the trial, the prosecutor stated to the jury, "if the defendant is innocent; if this story is true, why didn't he call as a witness Michelle, his girlfriend?" Defense counsel objected and moved for a mistrial. The motion was denied.

The prosecutor continued, "[t]he defense has no obligation, ladies and gentlemen, to put on a defense, but when they do start to put on a defense and leave somebody out, somebody who is important, somebody who can be crucial to supporting what the defendant said, then you may draw inferences from that." The defense objected again and was overruled, and the prosecutor continued over objection to state:

Michelle, the defendant's wife/girlfriend, could back up what the defendant said in this case about what happened in that motel room in Virginia.

She is not here. If you were on trial in a situation like this and your spouse could support what you said, wouldn't you expect her to be here to testify to that?

In the recent case of *Robinson v. State*, 315 Md. 309, 554 A.2d 395 (1989), this Court observed:

There is nothing mysterious about the use of inferences in the fact-finding process. Jurors routinely apply their common sense, powers of logic, and accumulated experiences in life to arrive at conclusions from demonstrated sets of facts. Even had there been no instruction concerning the availability of this inference, we think it likely that among the first questions posed in the deliberation of this case would have been, 'Why didn't the defendant produce Alvin Johnson?' Only if, as a matter of law, the unfavorable inference could not have been drawn by the jurors would the trial judge have been authorized to prohibit the prosecutor from posing that same question in argument.

*Id.* at 318, 554 A.2d at 399.

Appellant also contends that a missing witness argument is improper in the instant case since Michelle Nelson's

testimony would have been merely cumulative to the testimony given by the defendant. In *Robinson,* we pointed out that the missing witness inference is "... not available with respect to a witness whose testimony would be comparatively unimportant, or cumulative, or inferior to what is already utilized, so that the testimony might well be dispensed with by a party on general grounds of expense and inconvenience." *Id.* at 321, 554 A.2d at 401, citing 2 *Wigmore on Evidence,* § 286 (Chadbourne Rev.1979). We do not characterize Michelle Nelson's testimony as unimportant, cumulative, or inferior evidence. When coupled with the testimony about her close relationship to Appellant, there was sufficient basis to generate the missing witness argument made by the prosecutor.

### IX. *Failure to Give Instructions on Mere Presence of the Defendant at the Scene of the Crime and on Malice*

 Appellant alleges two errors in the court's instructions to the jury. His first complaint is that the court failed to give his requested instruction that mere presence at the scene of the crime is insufficient to support a guilty verdict.

We hold that the trial court did not err in failing to give the requested instruction since its instructions otherwise fairly covered the issue. The trial court instructed the jury that in order to find Appellant guilty, the jury must find that he acted as a principal in either the first or second degree, and if it did not so find, that it must return a verdict of not guilty. The trial court then gave detailed instructions on what is necessary to constitute a principal in the first or second degree, and that in order to convict, the jury must find first, that the defendant was present and, second, that he willfully participated in the crime with the intention to make the crime succeed. The Court carefully defined the requirement of willful participation, and even included that "some conduct has to be displayed by the defendant in furtherance of the crime." The court also gave specific examples of the kind of participation required in order to be guilty as an aider or abettor. Although the court did not

give the requested instruction, the instructions as a whole made it clear that mere presence at the crime scene alone was not sufficient to convict, and that willful participation was necessary for guilt.

■ Appellant's second complaint is that the court erroneously instructed the jury on the offenses of murder, attempted murder, and assault with intent to murder because the instruction omitted the element of malice. We first note that Appellant made no objection to the instructions on first and second degree murder, and attempted murder, and his only objection to the instruction on aggravated assault was as to the definition of assault. Because Appellant failed to make timely objection to the instructions, the issue is not preserved for our review. *Johnson v. State*, 310 Md. 681, 531 A.2d 675 (1987). Appellant suggests, however, that we should take cognizance of, and correct, plain error in the instructions material to the rights of the defendant. Maryland Rule 4–325(e). We find that the court's instructions do not constitute error, let alone plain error.

The court gave detailed instructions on first degree murder, including the required elements of willfulness, deliberation, and premeditation. The court also correctly defined second degree murder, attempted murder, and assault with intent to murder. As the definitions and the elements of both degrees of murder were adequate, the court was not required to use the word malice.[3] The Court was also not required to discuss justification, excuse, or mitigation, since no justification, excuse, or mitigation was generated or even remotely suggested in this case. In short, there was no error, much less, plain error in the court's instructions.

X. *Death Penalty Sentencing Hearing Failure to Give Instructions on Life Without Parole*

Appellant raises three contentions concerning the death penalty sentencing hearing. Since we reverse and remand

---

3. *See Ross v. State,* 308 Md. 337, 340 n. 1, 519 A.2d 735, 736 n. 1 (1987).

for a new sentencing hearing based on one of his contentions, we need not consider the remaining two.

 Appellant contends, and we agree, that the trial court committed reversible error in refusing to instruct the jury on the consequences of a sentence of life imprisonment without the possibility of parole. He argues that as a result, the jury could erroneously conclude that even a sentence of life imprisonment without possibility of parole might still result in the early release of Appellant, and therefore, fail to adequately punish Appellant for his conduct.

Counsel sought the following jury instruction, which was rejected by the trial judge:

> I instruct you that the term "life imprisonment without the possibility of parole" means imprisonment for the natural life of the Defendant. If your judgment is that Mr. Bruce should be sentenced to life imprisonment without possibility of parole, he will not be eligible for parole consideration, nor can he be granted parole at any time during his natural life.

Maryland Rule 4–325(c) provides: "The court ... shall instruct the jury as to the applicable law...." It is incumbent on the trial judge upon request to give an accurate instruction on the essential points of law involved in the proceeding. *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344, 1348 (1984); *Lansdowne v. State,* 287 Md. 232, 239, 412 A.2d 88, 91 (1980).

In *Doering v. State,* 313 Md. 384, 545 A.2d 1281 (1988), this Court held that the defense is entitled to have the jury consider as a mitigating factor evidence concerning eligibility for parole in the event a life sentence was imposed. *Id.* at 411–12, 545 A.2d at 1295. We stated:

> [W]e now conclude that a jury seeking to determine the appropriateness of a life sentence will be aided by information correctly describing the legal and practical effects of such a sentence, and that the existence of an appropriate alternative sentence must certainly be considered a

relevant mitigating circumstance. We hold, therefore, that where, as here, the defendant in a capital sentencing proceeding seeks to place before the jury relevant and competent information concerning his eligibility for parole in the event a life sentence is imposed, that request should be granted.

*Id.*

The Court also noted that in enacting Chapter 237 of the Laws of 1987 [now codified at Md.Code (1957, 1987 Repl. Vol.), Art. 27, §§ 412–13], the life without parole penalty statute, "we think the Legislature clearly articulated a policy in favor of greater jury involvement in matters of parole where the jury determines the sentence." *Doering* at 410, 545 A.2d at 1294.

We note that in enacting Art. 27, § 413A, which provides "[a] judge may not instruct the jury that the jury must assume that a sentence for life imprisonment is for the natural life of the defendant," the Legislature intended to assure that juries were not given incorrect information about the effect of a life sentence where the possibility of parole exists. That statute pre-dates and is in no way applicable to a sentence of life imprisonment without the possibility of parole.

In *Harris v. State*, 312 Md. 225, 539 A.2d 637 (1988) we noted:

Whether the punishment of life imprisonment without the possibility of parole, first authorized in capital cases by Ch. 237, Acts of 1987, will require reconsideration of the rule prohibiting reference to the possibility of parole at a capital sentencing proceeding is a question we leave for another day.

*Harris* at 251 n. 9, 539 A.2d at 649 n. 9. That day has arrived.

In weighing the appropriateness of a death sentence, the jury is entitled to know about the available sentencing alternatives. *Mack* at 592, 479 A.2d at 1348. Without some instruction by the judge, there is no reason to assume that

the jury will know the sentence of life imprisonment without parole will mean that a defendant will be ineligible for parole for the balance of his natural life. It is universally recognized that the literal words of a sentence to imprisonment are generally not an accurate indication of the effect of the sentence. It is common knowledge that a ten year sentence does not mean that the prisoner will serve ten years in prison, and it is also common knowledge that a life sentence does not mean that a prisoner will serve the balance of his natural life in prison. There is no reason for jurors to assume, unless told, that "life without the possibility of parole" means that a prisoner will never be eligible for parole. The legislature apparently saw a need to define "life without the possibility of parole" since Md.Code (1957, 1986 Repl.Vol., 1989 Cum.Supp.), Art. 41, § 4–516(b)(3)(i) provides, "[i]f a person is sentenced to imprisonment for life without the possibility of parole ... the person is not eligible for parole consideration and may not be granted parole at any time during the term of the sentence."

Without an appropriate instruction the jurors may not have understood that, as an alternative to the death penalty, they could impose a life sentence which would imprison the Appellant for the balance of his natural life. Had they been given a proper instruction on the meaning of "life without the possibility of parole," they may have concluded that this was adequate punishment and mitigated against the imposition of the death penalty.

For the reasons indicated, we find that the trial judge should have, when requested to do so, instructed the jury that a sentence of life imprisonment without the possibility of parole means that a defendant cannot be released on parole at any time during his natural life. This information can be relevant and assist the jury in determining whether death is the appropriate penalty.

JUDGMENTS AFFIRMED, EXCEPT AS TO THE IMPOSITION OF THE DEATH SENTENCES; DEATH SENTENCES VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR A NEW

SENTENCING PROCEEDING UNDER § 413 OF ART. 27;
COSTS TO BE EQUALLY DIVIDED.

McAULIFFE, Judge, concurring in part and
dissenting in part.

I agree that the convictions should be affirmed. I do not
agree that the trial judge committed reversible error when
he refused to give the defendant's requested instruction
10A, which dealt with the possible determination of life
imprisonment without the possibility of parole. The defen-
dant asked for this instruction:

> I instruct you that the term "life imprisonment without
> possibility of parole" means imprisonment for the natural
> life of the Defendant. If your judgment is that Mr.
> Bruce should be sentenced to life imprisonment without
> possibility of parole, he will not be eligible for parole
> consideration, nor can he be granted parole at any time
> during his natural life.

The State objected—not to that portion of the instruction
that explained the obvious, i.e., that life imprisonment with-
out parole means that the defendant will not be eligible for,
and cannot be granted, parole during his lifetime—but to
that portion which stated that " 'life imprisonment without
the possibility of parole' means imprisonment for the natu-
ral life of the Defendant." The State argued that a correct
statement of the law would have to include the possibility
that the Governor could at any time exercise the right to
commute the sentence, in whole or in part. Md. Const. Art.
II, § 20; Maryland Code (1957, 1986 Repl.Vol.) Art. 41,
§ 4–603. The prosecutor expressed his concern to the trial
judge that:

> They intend to get up and argue this man is never going
> to get out if you give him life without parole. That is not
> going to be correct.

Judge Levin did not give the requested instruction. In-
stead, referring to the Findings and Sentencing Determina-
tion form that each juror had been given, he told the jury:

As you can see by Section V ... if you have answered life imprisonment in Section V, you have to make a determination in Section VI whether the sentence should be life imprisonment without the possibility of parole. If you are in unanimous agreement that the defendant should serve his sentence of life imprisonment without the possibility of parole, answer "yes" in Section VI. Unless all of you agree that the defendant should be denied the possibility of parole, answer "no" to this question.

Section VI of the form, to which Judge Levin referred, provided:

### SECTION VI

If "Life Imprisonment" is entered in Section V, answer the following question:

Based upon the evidence, does the Jury unanimously determine that the sentence of life imprisonment previously entered shall be without the possibility of parole?

yes no

The better course would have been for the trial judge to give that portion of the defendant's requested instruction that clearly and unequivocally stated that a sentence of life imprisonment without the possibility of parole would be just that—the defendant could not be given parole if that sentence were imposed. That would have required only slight editing of the defendant's proposed instruction.

The failure to pursue the better course does not, however, mean that there was error, or that if there was error, it required reversal.

In the first place, the term "life imprisonment without the possibility of parole" needs no explanation. It is self-explanatory. The situation that existed here is entirely different from that the Court faced in *Doering v. State*, 313 Md. 384, 407–12, 545 A.2d 1281 (1988). That case dealt with the defendant's attempt to provide the jury with accurate factu-

al and legal information in order to avoid the significant potential for misunderstanding that otherwise would exist because of widespread confusion and misunderstanding among lay persons concerning the practical effect of a "life" sentence. The defendant's concerns in *Doering* were very real. As I noted in *Harris v. State*, 312 Md. 225, 263, 539 A.2d 637 (1988) (McAuliffe, J. concurring):

> I believe the average juror is unaware of the intricacies of parole eligibility law, and is more likely to have been exposed to the generally apocryphal stories concerning murderers who were released on parole within a year or two of their convictions.
>
> Ordinarily, we are not reluctant about sharing with the jury the true state of the law, and we should have no reticence in this area.

This Court thereafter concluded in *Doering, supra,* 313 Md. at 411–12, 545 A.2d 1281 that:

> [A] jury seeking to determine the appropriateness of a life sentence will be aided by information correctly describing the legal and practical effects of such a sentence, and ... the existence of an appropriate alternative sentence must certainly be considered a relevant mitigating circumstance.

Here, we deal not with the effect of a "life" sentence, but with the effect of a sentence of life imprisonment without possibility of parole. I am not aware that there exists any popular misunderstanding or misconception concerning the sentence of life without possibility of parole. The meaning of the term is self-evident, and particularly so when it is presented to the jury as an alternative to the sentence of life imprisonment. The considerations that properly impelled the Court to reverse the sentence in *Doering* are simply not present here.[1]

---

1. Bruce did submit proposed instructions dealing with the effect of a life sentence. He did not, however, object to the failure of the trial judge to give those instructions, and the matter is not preserved for appellate review unless this Court concludes there was plain error

In the second place, if there were any need to inform the jury of the actual effect of a sentence of "life imprisonment without parole," Judge Levin's instruction fulfilled that need. He told them that the imposition of that sentence meant that the defendant would be denied the possibility of parole.

> If you are in unanimous agreement that the defendant should serve his sentence of life imprisonment without the possibility of parole, answer "yes" in Section VI. Unless all of you agree that the defendant should be *denied the possibility of parole,* answer "no" to this question. (emphasis added).

The prosecutor did not argue to the contrary. He did not address the effect of either life sentence. Defendant's attorney twice argued, without objection, concerning the meaning of a sentence of life imprisonment without the possibility of parole. Near the beginning of his closing argument, he said:

> If you determine that he lives, you are then called upon at the end of the form to decide whether he is sentenced to life, or whether he is sentenced to life without parole, *meaning life without the chance of being paroled at a future time.* (emphasis added).

That argument was entirely consistent with the instruction earlier given by Judge Levin. Again, at the conclusion of defense counsel's argument, he said:

> I think the great doubt that exists there, coupled with the great amount of mitigating circumstances, justifies you in returning a verdict of life imprisonment. If you feel that that is not severe enough—and that is the second most severe penalty that can be imposed under our law for a person to be caged and housed in the penitentiary for the

material to the rights of the defendant. Maryland Rule 4–325(e). In view of the fact that the jurors rejected the more stringent sentence of life without parole, it is immaterial that they were not fully instructed concerning the minimum eligibility of the defendant for parole under a life sentence.

rest of his natural life—if that is not severe enough you can attach "without the possibility of parole."

I cannot agree that the trial judge erred in instructing the jury as he did on the possible sentence of "life without possibility of parole." Alternatively, if there was error, that error was harmless beyond any reasonable doubt. I would affirm the sentence of death.

MURPHY, C.J., and RODOWSKY, J., join in this opinion.