639 A.2d 188

**Mark John WOODLOCK**

**v.**

**STATE of Maryland.**

**Aaron Tyrone McCOY**

**v.**

**STATE of Maryland.**

**Nos. 1162, 1163, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

April 5, 1994.

James Wyda, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Joseph I. Cassily, State's Atty. for Harford County, Bel Air, on the brief), for appellee.

Submitted before WILNER, C.J., BISHOP, and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

JAMES S. GETTY, Judge, Specially Assigned.

On May 29, 1993, Mark John Woodlock and Aaron Tyrone McCoy, the appellants in this case, were convicted after a three-day jury trial in the Circuit Court for Harford County of robbery, conspiracy, theft, and battery. Woodlock received a ten year sentence for robbery and a concurrent ten year sentence for conspiracy. McCoy's sentence was for six years on each count, to be served concurrently.

This appeal ought to be about the robbery that occurred at 5:00 p.m. on October 8, 1992, at the P.M. Creations Jewelry Store in Harford County, when two males stole two diamond bracelets after spraying the store owner with mace. The appeal, however, is not about the robbery; appellants never mention it, perhaps because they were apprehended within two hours of the robbery, following a high-speed chase on Route I–95, with the diamond bracelets in their possession.

In view of the overwhelming evidence of guilt, appellants seek to distance themselves from the robbery by arguing that a mistrial should have been granted on the second day of trial when the trial judge ordered that appellants be bound and gagged. The principal issue on appeal, therefore, involves the unsuccessful efforts by appellants to sabotage the trial through disruptive behavior that included threats toward the trial judge, offensive language, demands that defense counsel be replaced, and a refusal to remain in the courtroom. Without justification, appellants sought to provoke the court into taking action that might warrant appellate reversal. They failed.

The following issues have been raised:

I.   The trial court erred in denying appellants' motion for mistrial.

II.  The trial court erred in admitting prejudicial evidence.

III. The trial court erred in denying appellants' motion for mistrial for the State witnesses' repeated references to uncharged criminal conduct.

IV.  The trial court erred in admitting identification evidence of appellant Woodlock by Paul and Jan Metzner.

V.   The trial court erred by denying appellant's motion to dismiss for lack of a speedy trial.

VI.  The trial court erred in permitting identification testimony based upon viewings in violation of the sequestration order.

VII. The trial court improperly considered at sentencing appellant Woodlock's non-residency in Harford County and uncharged criminal conduct.

*Issue I*

Appellants demanded a mistrial on the second day of trial after they provoked the following course of events:

Woodlock interrupted the roll call of the jury by asking the court to dismiss his counsel. The court excused the jury and engaged in a lengthy discussion with both appellants about

proceeding without representation. Neither appellant could recite any valid reason for dismissing counsel, and, after repeated interruptions, the court decided to proceed with the trial and instructed both appellants to be quiet.

The court's efforts to proceed with the trial were greeted with the following response by Woodlock as the jurors were returning to their seats:

"F--- that man. Do whatever. Do whatever man. F--- that. You all can do whatever with me man."

The court granted a recess when appellants asked to leave the courtroom.

Out of the presence of the jury, appellants were advised by the court that unless they behaved, they would be bound and gagged. This warning prompted the following challenge: Woodlock, who was 6'6" tall, said someone would have to "beat [him] down," and he "was going to say an outburst" (as the jury returned), and "I want to see somebody to try and bind and gag me." Both appellants demanded again that they be removed from the courtroom.

The court directed that the jury be removed again, but the outbursts continued and the deputies were instructed to bind and gag the appellants. As appellants were being removed from the courtroom, Woodlock continued his oppugnant tirade directed to the court, stating:

"You're a damned fool. The jury heard all of this. You're a nut. You're a cracker ass mother–f------. Crazy ass mother–f------."

When appellants and the jury were removed again from the courtroom, the court sent defense counsel to the lockup seeking a firm answer on representation. Both appellants were returned to the courtroom, out of the presence of the jury, but neither man would respond until the court said, "lacking a response, counsel [will] remain." Appellants then stood as if to leave the courtroom and they were again warned that when court resumed in the afternoon, any outbursts within the presence of the jury would result in an order to bind and gag them, or to conduct the trial without them.

The afternoon session was a continuation of what had already occurred.  As the jury was returning, both appellants resumed their verbal assault upon the court which prompted an order that they be bound and gagged and the jury was excused.  Both appellants demanded that a mistrial be granted and they insisted that they could not be restrained.  At some point, a deputy used a stun gun to restrain Woodlock.

Appellants' counsel requested either a mistrial based upon the use of the stun gun, which the jury allegedly witnessed, or a curative instruction.  The court denied the oral motion for a mistrial citing the "deliberate sabotage" efforts of appellants seeking to destroy an orderly resolution of the criminal charges.  The court advised the jury that it could not consider the disruptive behavior of appellants in deciding guilt or innocence.

The courts uniformly rely upon an abuse of discretion standard for reviewing the action of trial judges in the matter of restraint.  *Hunt v. State*, 321 Md. 387, 583 A.2d 218 (1990); *Bruce v. State*, 318 Md. 706, 569 A.2d 1254 (1990).  A reviewing court does not engage in speculating whether less oppressive security measures were available to the trial court, provided that the measures employed were reasonable.  This is so because we were not present and thus we cannot gauge the tension that existed in the courtroom, the degree of hostility exhibited by the defendants, their ability to carry out the threats they made, or the immediacy of the danger to all persons present in the courtroom.  What we measure, therefore, is whether the methods applied were reasonable and whether they posed an unacceptable risk of prejudice to the defendant.  *Bruce, supra,* at 408.

Obviously, placing restraints such as gags, handcuffs, or leg irons on a defendant at the guilt/innocence stage of a trial is inherently prejudicial and must be a response to a compelling State interest.  In *Hunt, supra,* the Court of Appeals recognized three essential State interests that may justify physical restraints of defendants.  They are:

1.  Preventing the defendant's escape,

2. Protecting those in the courtroom, and

3. Maintaining order in the courtroom.

Based upon the record in this case, we hold that the measures applied were reasonable and did not pose an unacceptable risk of prejudice to these appellants. The restraints were clearly required in order that the trial could proceed in an orderly fashion to its conclusion. The court, moreover, was faced with not one but two belligerent defendants, one 6'6" and the other 6' or more, who were openly threatening anyone who attempted to subdue them as the court ordered. The court did not order the use of a stun gun, but the officer in charge of courtroom security clearly concluded that use of the control device was necessary to control Woodlock's continuing abuse of the court and his attempt to depart from his seat in the courtroom.

We point out, furthermore, that the indignities that appellants clamor about were self-inflicted and knowingly orchestrated to produce the results that evolved. The prejudice to be avoided in confrontations like the one before us is that guilty verdicts may result from disruptive behavior observed, rather than from evidence presented by the witnesses to the crimes charged in the indictment.

In that sense, the prejudice to appellants herein is minimal. This case is about as open and shut as one may imagine. Within two hours of the robbery appellants were apprehended with the stolen property in their possession. The fingerprints of one of the appellants, moreover, were obtained from the glass showcase where the robbery occurred. Appellants' conduct had no rational purpose except to sabotage the proceedings. Judge Maurice W. Baldwin, Jr., exhibited laudable restraint and extended every opportunity to appellants for a fair and impartial hearing. Judge Baldwin's efforts were rejected at every stage of the proceedings. His conduct of the trial was not an abuse of discretion, it was discretion conscientiously and, fundamentally, fairly exercised.

*Issue II*

■ Appellants complain that a witness prejudiced them by stating he sent their fingerprints to the FBI for comparison purposes, thereby creating the impression that they had prior records.

The necessity for the comparison of fingerprints arose when both appellants gave false names at the time of arrest. The legitimate purpose of the testimony was to clarify the identification of the appellants. FBI fingerprint records, furthermore, cover untold thousands of records that are not in any way connected with criminal activity. Reference to the FBI does not necessarily raise the assumption that an FBI record check points to prior criminal conduct. We see no basis for appellants' claim that an "other crime analysis" was generated on the facts of this case. The court did not abuse its discretion in overruling appellants' objection to the use of the term "FBI" in describing the manner of positively identifying appellants. Even if we were to conclude that mention of the FBI was error, it would not warrant reversal in view of the overwhelming evidence of guilt.

*Issue III*

■ Out of an abundance of caution the court agreed that no mention would be made of appellants' attempts to ram the police cars during the high-speed chase resulting in their arrest, a concession that, in our view, they were not entitled to receive, irrespective of whether they were charged with a separate offense arising from the attempts to disable their pursuers. This is tantamount to arguing that if a vehicle fleeing from the police went through a school zone in the presence of numerous children, the police could not testify that the fleeing felons were clocked at 100 mph, because they were not charged with exceeding the posted limit of 15 mph. No such rule exists; a description of the actual chase was clearly admissible.

In describing the rolling roadblock, two officers stated that appellants attempted to strike the police cars. A mistrial was

requested and denied. The court instructed the jury, however, that any attempts to strike the police vehicles were not to be considered as evidence of guilt. Having been granted more than they were entitled to receive, denial of a mistrial was pellucidly not an abuse of discretion.

## Issue IV

■ Appellants next attack the pretrial identification of one of the appellants by Jan and Paul Metzner, owners of the jewelry store. Both Mr. and Mrs. Metzner were present at the police station the night of the robbery to view a lineup. While the procedure was being explained to them, another officer inadvertently entered the room with one of the appellants. When Mrs. Metzner noticed the suspect, she said immediately, "That's him ... book him." The lone man in custody was Woodlock. Paul Metzner also recognized Woodlock as one of the two robbers. Both witnesses were positive in their identification of Woodlock at every stage of the proceedings, and they had face-to-face conversations with both appellants for approximately fifteen minutes the day of the robbery.

Additionally, there is no evidence that the police engaged in unnecessary suggestiveness in what transpired at the police station. By all accounts, the officer escorting Woodlock to the police station was not aware of the Metzners' presence.

Whatever corrupting influence the chance meeting may have spawned, it was clearly overcome by the reliability of the identification by both victims. The accuracy of the prior description, the witnesses' opportunity to view their assailants, the relatively short interval between the crime and the confrontation, and the positive assertion that the chance meeting was totally unnecessary to a positive identification reinforce the reliability of the Metzners' testimony.

## Issue V

Next, appellants seek to rescue themselves by claiming they were denied a speedy trial. Md.Rule 4–271(a) requires that a

trial date shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court, and shall not be later than 180 days from the earlier of those dates.

In this case, McCoy's counsel entered an appearance on November 13, 1992, and Woodlock's counsel appeared on November 20, 1992. The original trial date of February 17, 1993 was postponed by the administrative judge due to the lack of a judge or a courtroom. A motions hearing was then scheduled for April 13 and 14 with the trial date set for May 26, 1993. The actual trial date exceeded the 180–day rule by nine days as to Woodlock and by 16 days as to McCoy. Neither appellant alleges any prejudice other than what may flow from the technical violation of exceeding the arithmetical calculation of the time involved. We may assume, therefore, that no prejudice resulted from the ever so slight delay. There was testimony that May 26 was the first date when all counsel were available.

In Harford County, apparently, all criminal cases are scheduled by the State's Attorney's Office. Kathy Carter testified that she did the scheduling of criminal cases and after the initial postponement by the administrative judge the first available motions hearing date was April 13, and the first trial date was April 23. She set the motions hearing requested by appellants for the 13th, but the next available trial date acceptable to all parties was May 26 which was agreed to by all counsel.

The trial court accepted this testimony. Where counsel, being aware of the Rule, consents to a trial date beyond the limitations set by the Rule, dismissal would be an inappropriate sanction for non-compliance. *State v. Lattisaw,* 48 Md.App. 20, 425 A.2d 1051 (1981).

A balancing of the four factors set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is of no help to appellants in considering whether they were denied a speedy trial under the Sixth Amendment. Clearly,

they neither allege nor suffered any prejudice, and there is no constitutional right to be tried within a specified time. *Powell v. State,* 56 Md.App. 351, 467 A.2d 1052 (1983), citing *Barker v. Wingo, supra.*

## *Issue VI*

Appellants claim that two State's witnesses who saw them shackled should not have been permitted to testify. The issue is patently frivolous. They were seen by the witnesses in the corridor while being removed from the courtroom for disruptive behavior. These facts do not establish a police showup, or a violation of a sequestration order. With or without this cumulative testimony, the outcome of this trial would not have rested on the presence or absence of these two witnesses.

## *Issue VII*

Even in light of the disruptive and improper conduct of appellants in attempting to obstruct and prohibit the orderly progression of the proceedings in this case, we discern not a scintilla of evidence that the trial judge was motivated by ill will or prejudice in imposing sentence on appellants. On the contrary, the trial court proved that the system is stronger than its detractors and that even those who seek to destroy the right to a fair and impartial trial by a jury of their peers get one nevertheless.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.