959 A.2d 90

**STATE of Maryland**

v.

**Kevin LATHAM.**

**No. 01724, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Oct. 29, 2008.

598

600

James E. Williams (Douglas F. Gansler, Atty. Gen., on brief), Baltimore, for Appellant.

Deborah S. Richardson (Nancy S. Forster, Public Defender, on brief), Baltimore, for Appellee.

Panel: DAVIS, CHARLES E. MOYLAN, JR., (Retired, Specially Assigned),* ADKINS, SALLY D., JJ.

ADKINS, J.

On May 17, 1996, appellant Kevin Latham shot and killed 17 year old Harvis Coleman as he stood in front of his Baltimore

---

* Adkins, Sally D., J., now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a specially assigned member of this Court.

City home. The State appeals a judgment granting Latham postconviction relief on the ground that he received ineffective assistance of counsel at his 1997 jury trial on murder and handgun charges. In the eight years between conviction and Latham's petition for postconviction relief, trial counsel became unavailable to testify due to his conviction and disbarment for perjury. On the basis of the trial record and Latham's postconviction testimony, the Circuit Court for Baltimore City ruled that defense counsel prejudicially failed to request any relief after a juror saw Latham in shackles outside the courtroom, to request jury instructions on perfect and imperfect self-defense, and to present mitigating evidence to explain why Latham was wearing a bullet-proof vest when he shot Coleman. The State raises the following three issues:

I. Did the post conviction court err in determining that Latham's counsel was ineffective for not asserting defenses of perfect and imperfect self-defense, when those defenses were incompatible with Latham's counsel's chosen trial strategy?

II. Did the post conviction court err in determining that Latham's counsel was ineffective for not requesting a remedy based on Latham's claim that a juror briefly saw Latham in shackles outside of the courthouse?

III. Did the post conviction court err in determining that Latham's counsel was ineffective for not introducing evidence of Latham's prior altercations in his neighborhoods to mitigate the State's unsuccessful premeditation argument?

After conducting our own independent constitutional appraisal of the trial and ineffective. Accordingly, we shall reverse the judgment awarding Latham a new trial.

## FACTS AND LEGAL PROCEEDINGS

### The Trial

Over a four day jury trial, the State established that at around 3:00 p.m. on May 17, 1996, Harvis Coleman was

standing outside his home at 1932 West Lafayette Avenue in Baltimore, with his 10 year old brother Velmar Coleman [1] and his 13 year old cousin Michael Parker. Kevin Latham rode down the street on a bicycle, then stopped in the middle of the road in front of the Coleman residence. Velmar and Parker both testified that Latham, whom none of them had ever seen before, said "What's up," to which Harvis replied, "What's up." According to Velmar, Latham then pulled a gun from his back pocket and shot Harvis. Velmar testified that after Latham fired, Harvis shot at Latham, hitting him in the knee. Both Velmar and Parker agreed that Latham shot first. But according to Parker, Harvis pulled the gun from his "dip" in the front of his stomach before Latham fired.

Parker fled, but Harvis and Velmar retreated into their home, where Harvis fell on the floor. The bullet had passed through Harvis's upper arm and traveled into his chest, where it bisected his aorta and continued into his lungs. The medical examiner estimated that he died about one minute after the shooting.

Baltimore City Police Officer Joseph Bertrand heard two gunshots while he was patrolling nearby. He responded to the scene within ten seconds of the last shot, where he found Latham wounded and lying next to his bicycle in the middle of Lafayette Avenue. Latham was wearing a bullet-proof vest. A .380 cartridge casing lay about ten feet from him, but no matching weapon was ever found. According to Bertrand and other police officers who regularly patrolled that high crime neighborhood, a gun left on the street would "probably" have been taken by someone rather quickly.

Bertrand testified that he secured the crime scene, then learned that there was another shooting victim inside the Coleman residence. After finding a 9 millimeter cartridge casing on the sidewalk in front of the home, Bertrand entered the home. He found Harvis lying dead on the floor, between

---

1. For clarity, we shall refer to the Coleman brothers as Harvis and Velmar.

the front hall and the dining room, with a 9 millimeter semi-automatic handgun nearby on the dining room floor.

The defense theory advanced by trial counsel was that Latham did not shoot Harvis Coleman, but was caught in crossfire exchanged between Coleman and an unidentified shooter. This strategy required an explanation for why Latham's left hand had tested positive for gunpowder residue. The State's gunpowder residue expert acknowledged that "there is a possibility these residues were transferred from the firearm or from an object which was right near the muzzle of a firearm when it went off[,]" at a distance of two and a half feet to six inches. Although it was "really unlikely," a subject also could get gunshot residue on his hand if he "reached over to grab" the gun as it was being shot. But "[m]ost probably," he testified, Latham's "hands were immediately adjacent, right next to a discharging firearm or else his hands were used to fire a firearm within a few hours of 4:25 on May 17, 1996."

At the end of a second day of jury deliberations on July 22, Latham complained to the trial court that a juror had seen him "outside" when he was shackled and handcuffed for boarding into a correctional services vehicle. At the time, trial counsel was not present in the courtroom, because the trial court had permitted both attorneys to leave the courtroom during deliberations with the proviso that "you do have to be back within five minutes if there is a question or verdict, so govern yourselves accordingly." At 5:30 that afternoon, the court reconvened for the purpose of dismissing the jury for the evening, but trial counsel did not answer the court's summons. When Latham said that he wanted to wait for his lawyer, the court agreed to wait "a couple minutes to see if he gets here." After a short recess, the court talked to Latham at a bench conference:

The Court: Sir, you want to come up?

The Defendant: One of the jurors seen me.

The Court: Who saw you?

The Defendant: I don't know the name.

The Court: You think they saw you?

The Defendant: They seen me outside.

The Court: Outside there?

The Defendant: Outside. When I thought about it, I wanted to wait until they left.

The Court: We'll inquire about this later.

Trial counsel did not return to the courtroom. The court dismissed the jurors until the next morning, then asked his law clerk whether he had located Eaton.

The Court: Did you find Eaton? Where is he?

Law Clerk: He said he was still in his office.

The Court: Did you tell him to get here or would you like me to send a sheriff for him? I told him to get here. Did you tell him to come here? You mean you had him on the phone and you didn't tell me you had him on the phone?

Law Clerk: No, I didn't because you were releasing the jury.

The Court: Unbelievable. Get him here, Sir. I don't care what you do, but get him here. . . . As soon as you get him, tell him to get here immediately. He'll be here. . . .

(Whereupon, a recess ensued). . . .

Law Clerk: Judge, they're telling me that he left.

The Court: I can't believe it. Now what if you have a problem with the jurors, Jim? What are you going to suggest we do then?

Law Clerk: What's that, Judge?

The Court: The problem with this juror seeing him? Tell them to find him and send somebody over here immediately. You're unbelievable. . . .

The Court: Call his supervisor, whoever answered, tell him I'm outraged that he wasn't here. Tell him you made a great blunder and that I expect him and his supervisor here at 9:30 promptly. . . . And, Sir, then you can tell him there is a problem in that I have released the alternate and I could have done something before I released them.

The Defendant: Yes.

The Court: Now the problem is with what we do, okay? But **we'll discuss that with your lawyer when he's here**. . . . Which one was it? Do you remember where the Juror was sitting?

The Defendant: Juror 4. . . . The one that start from this side. . . .

The Court: So it was the middle aged lady number 4.

The Defendant: Yes. Light skinned.

The Court: Older lady.

The Defendant: Yes.

The Court: To you old, to me middle aged. But you see sir the problem is [that] I also want you to think about, **we'll go over that with your lawyer and I'll repeat what I told you,** often it is amazing how jurors will turn away almost like they don't want to see.

I haven't had a juror—**the way I handle it if that happened during trial I would bring her up and I would say did you have occasion to stop anyone related to this trial outside of the courtroom since the trial began.**

**And it is amazing, I have never had one say yea.** It's almost when they see somebody in chains, they'll look away. They don't look. I mean, but there is a first for everything, you know.

The Defendant: I guess coming out here five or 6 in the evening you're bound to look at anything especially in chains. That's why.

The Court: Um-hum. Well, there are some options. **We'll see what you decide after you speak to your lawyer** and we'll do that in open court. (Emphasis added.)

The trial court assured Latham that "we'll do that as soon as" trial counsel "checks in" and before the jurors resumed deliberations.

The next morning, defense counsel appeared and the matter was discussed. The trial court considered the options:

The Court: Because what I may do is if they are all here at 9:30, release them in deliberations, then put that problem,

which was on the record and dealt with your client's allegation that Juror Number 4 saw him in shackles before the jury was released into deliberations. And I explained to him the difficulty I could have to replace with an alternate had he told you. And I also told him more often—

Mr. Eaton: **I'm sure we can talk.**

The Court: And I told him more often than not it is amazing. I have not had one juror actually see a defendant because there is a reluctance to look at somebody with shackles full face, you know.

**There are several things we can do and I told him we would discuss that more fully when and if you came back.**

You also should take time to apologize to my clerk because, although he may not know better, you should have known better to be here. (Emphasis added.)

Thereafter, defense counsel did not raise the issue of Juror No. 4 again.

During deliberations, the jury asked for further instruction as to the difference between first and second degree murder, and the trial court gave supplemental instructions in response. The jury acquitted Latham of first degree premeditated murder, but found him guilty of second degree murder and use of a handgun to commit a crime of violence. The trial court sentenced Latham to twenty years (the first five without parole) on the handgun charge and a consecutive thirty years for the murder.

This Court affirmed the convictions. *See Latham v. State*, No. 1469, Sept. Term 1997, 121 Md.App. 720 (1998), *cert. denied*, 351 Md. 4, 715 A.2d 963 (1998). In doing so, we held that Latham had waived his complaint that the jury should have been instructed on self-defense, because trial counsel failed to request such instructions. After the Court of Appeals denied *certiorari*, Latham filed for a review of his sentence. A three-judge panel affirmed the sentences without a hearing.

## Postconviction Proceedings

On May 3, 2005, Latham filed a *pro se* petition for postconviction relief in the Circuit Court for Baltimore City. Later, through the public defender, Latham filed a supplementary petition, alleging the following four ineffective assistance claims:

(1) Trial counsel failed to request a jury instruction on perfect or imperfect self-defense;

(2) Trial counsel failed to seek a mistrial, curative instruction, or *voir dire* after a juror saw Latham in shackles outside the courthouse;

(3) Trial counsel failed to subpoena medical evidence and/or witnesses to support Latham's explanation for wearing the bullet-proof vest; and

(4) Trial counsel failed to file a motion for modification of sentence.

On November 2, 2005, the postconviction court held a hearing at which Latham testified in support of his petition. David Eaton, who served as Latham's trial counsel, was precluded from testifying under Md.Code (1973, 2006 Repl. Vol.), section 9–104 of the Courts and Judicial Proceedings Article (CJP), because he had been convicted of perjury.[2]

On August 30, 2006, the postconviction court granted the petition, holding that trial counsel "was ineffective for failing to seek a remedy after a juror saw [Latham] in shackles and handcuffs." Seeing the shackled Latham boarding the security van alone "may have given the juror the impression that [Latham] was highly dangerous and needed to be separated from other inmates." This "posed the unacceptable risk that impermissible factors came into play in the jury's verdict." Moreover, the postconviction court concluded that, although "[t]he trial record is not exactly clear when and how the incident transpired, . . . it is clear that [Latham's] counsel was

---

**2.** Eaton pleaded guilty, *inter alia,* to perjury charges on February 7, 2002, and was subsequently disbarred. The record does not indicate that the perjury related to Latham's case.

not in court when [Latham] brought this to the attention of the judge as the jury was concluding deliberations on the second day of trial." Trial counsel's failure "to take any further action to mitigate the potential prejudice to his client" fell below the standard for reasonable representation, and prejudiced Latham's defense. Specifically, the postconviction court found trial counsel deficient for not demanding *voir dire* of the juror "to determine if she had seen [Latham] in shackles, and if so, how that viewing may have affected her judgment[,]" for not moving for a mistrial, and for not requesting a curative instruction. The postconviction court could not "conceive of a trial tactic or strategy that could or would justify failing to pursue one or more of these actions under the circumstances of this case." "At a minimum, the juror should have been *voir dired* [.]"

In addition, the postconviction court concluded that trial "counsel's performance was deficient when he failed to request jury instructions on, and to obtain evidence in support of [Latham's] claims of perfect or imperfect self-defense." The court reasoned:

[T]here does not seem to be a plausible trial strategy that would justify counsel's failure to request jury instructions on this subject, or to obtain and present evidence in support of such defenses, in this case. The record clearly shows that there was an exchange of gunfire between [Latham] and the victim. The victim's cousin, Michael Parker, testified at least five times at trial to the effect that immediately prior to the shooting, [Latham] had said "What's up?" to the victim, the victim had responded "What's up?" to [Latham], and then "they started shooting at each other." Petitioner was indisputably shot in the leg by the victim and injured, and required multiple operations.

**It seems apparent that a reasonably prudent defense attorney would assert the defenses of perfect or imperfect self-defense under these circumstances.** However, APD Eaton made no such effort in the case.... **Counsel's failure to request such instructions, or to object when they were not given, constitutes deficient performance**

that was likely prejudicial to [Latham]. (Emphasis added and citation omitted.)

Finally, the postconviction court ruled, trial counsel was also ineffective in failing to pursue or present evidence that would have offered the jury an innocent explanation for why Latham was wearing a bullet-proof vest. Pointing out that "the State made a major issue of the fact that [Latham] was wearing a bulletproof vest [or 'body armor'] at the time of the shooting," and that the trial court "emphasized the body armor during the sentencing phase of the trial[,]" the postconviction court concluded that counsel should have followed up on Latham's claim that he routinely wore body armor because he had previously been stabbed and shot:

> [Latham] indicated in his Supplemental Petition, as well as at the Post Conviction Hearing . . . that he had been shot and stabbed in this neighborhood several times prior to the incident in question, and had been treated in local hospitals on each occasion. [Latham] stated that he had told APD Eaton of these facts prior to trial, and that he further advised counsel that, whenever he went outside, he always wore a bulletproof vest for protection. APD Eaton, however, failed to subpoena medical records that would have supported his claims of hav[ing] been shot and stabbed in the past, and counsel failed to subpoena witnesses who could have confirmed [Latham's] regular habit of wearing a bulletproof vest. In conjunction with his Post Conviction hearing, [Latham] submitted a medical report dated July 22, 1990, documenting his treatment for a knife wound at Bon Secours Hospital on West Baltimore Street. APD Eaton certainly could have obtained this and other medical reports as well. It would seem apparent that such evidence would have supported [Latham's] contention that he was not the aggressor in the shooting, and might have minimized or negated this damaging piece of evidence. Counsel's failure to obtain such evidence falls below an objective standard of reasonableness, and was likely prejudicial to [Latham].

The postconviction court concluded that the latter two aspects of trial counsel's deficient performance "serve[ ] to

reinforce [its] conclusion that a new trial is required" on Sixth Amendment grounds due to counsel's failure to pursue any remedy with respect to the juror sighting Latham in shackles. The State was granted leave to file this timely appeal.

We shall add details about the trial and postconviction records as they pertain to each assignment of error.

## DISCUSSION

### Standard Of Review

The standard governing ineffective assistance of counsel claims is well established:

Under *Strickland [v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ], and its progeny, in order to demonstrate ineffective assistance of counsel, the Supreme Court has stated that a petitioner must prove that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense.... To prove deficient performance, the defendant must identify acts or omissions of counsel that were not the result of reasonable professional judgment. The standard by which counsel's performance is assessed is an objective one, and the assessment is made by comparison to prevailing professional norms. Judicial scrutiny of counsel's performance is highly deferential, and there is a strong (but rebuttable) presumption that counsel rendered reasonable assistance and made all significant decisions in the exercise of reasonable professional judgment. "[T]he inquiry has two foci: first, a performance evaluation under prevailing professional norms; and second, an inquiry into whether the defendant suffered prejudice as a result of deficient performance."

*In re Parris W.,* 363 Md. 717, 726–27, 770 A.2d 202 (2001) (citations omitted).

When evaluating trial counsel's performance, a post-conviction court does not start with a blank slate. To the contrary, as the Supreme Court instructed, the

court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted).

■ "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'" *Id.* The highly deferent *Strickland* standard of review recognizes that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* For that reason, postconviction courts must examine the acts or omissions alleged to be deficient in light of all the facts and circumstances, "viewed as of the time of counsel's conduct[,]" so that we "eliminate the distorting effects of hindsight[.]" *Id.* at 689–90, 104 S.Ct. at 2065–66.

■ Our appellate role in reviewing ineffective assistance of counsel claims is to

evaluate anew the findings of the lower court as to the reasonableness of counsel's conduct and the prejudice suffered. Whether counsel's performance has been ineffective is a mixed question of fact and law. As a question of whether a constitutional right has been violated, we make our own independent evaluation by reviewing the law in applying it to the facts of the case. We will not, however, disturb the findings of fact and credibility determinations of the post-conviction court, unless they are clearly erroneous. Instead, we "re-weigh the facts as accepted in order to determine the ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed."

*State v. Purvey*, 129 Md.App. 1, 10–11, 740 A.2d 54 (1999) (citations omitted), *cert. denied*, 357 Md. 483, 745 A.2d 437 (2000).

## I.
### Juror Sighting Of Shackled Defendant

 At the postconviction hearing, Latham testified that, as he was getting into the correctional services van after 5 p.m. on the day the jury began deliberations, he and Juror No. 4 "made eye contact. . . . She looked dead in my face and she looked surprised, as I looked surprised." The next morning, Latham testified,

> I brought it to my attorney's attention about the juror. And possibly he never said anything. And when [I] got up in the courtroom, I brought it to the judge's attention. And we talked brief [sic] about it. . . . And [the judge] said; okay, we're going to wait til your attorney gets here. . . . M[r]. Eaton never showed up. . . . And then [the judge] asked me do I want to proceed without him being there, I said; no, I want him present here.

According to Latham, the following morning, "as soon as [trial counsel] came back, the Court told" counsel about the juror incident.

As set forth above, the trial transcript from July 23 shows that the trial court informed trial counsel about the juror incident before deliberations resumed. The court recounted that he had observed to Latham that such sightings are often insignificant, but that "[t]here are several things we can do" and that these would be discussed "more fully" upon trial counsel's return. Trial counsel responded that he and Latham "can talk." No further mention of the juror incident appears in the trial record.

The State argues that the postconviction court "erred in determining that Latham's counsel was ineffective for not requesting a remedy based on Latham's claim that a juror briefly saw Latham in shackles outside of the courthouse." We agree. Applying established postconviction principles to

the facts as the trial and postconviction records reveal them, we conclude that trial counsel's representation in regard to this incident did not fall below the standard of reasonableness.

The Court of Appeals has recognized that there are legitimate State interests, including preventing escape, that justify shackling. *See Hunt v. State,* 321 Md. 387, 410, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). Nevertheless, the Supreme Court has held that trying a defendant in shackles is "inherently prejudicial" so that it merits "close judicial scrutiny" to protect the fairness of the factfinding process. *See Holbrook v. Flynn,* 475 U.S. 560, 568, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986)(shackling of defendant in front of the jury is one of the "inherently prejudicial practices" that warrants "close judicial scrutiny," but is not "always fatal"); *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970)("the sight and sound of shackles and gags might have a significant effect on the jury's feelings about the defendant," but may be warranted when necessary to control defendant).

Here, the trial record shows that the court did not exercise its power to *sua sponte* question the juror, give curative instructions, or order a mistrial. Instead, at Latham's request, the court informed trial counsel about the incident the next morning, before deliberations resumed. Trial counsel responded that he would talk to Latham. Applying the strong presumption that counsel's conduct reflects sound trial strategy, we assume that counsel did discuss the matter with Latham, and then chose not to further mention the incident on the record. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. It is Latham's burden to overcome that presumption. *See id.* On this record, he has not done so.

Notably, the trial court did not consider the incident to be serious enough to require any of the remedial measures now advocated on postconviction as "the bare minimum" merited by the circumstances. To the contrary, the trial court asked Latham whether he wanted to consult with counsel, and granted Latham's request to do so, adding that in its experi-

ence, such incidents have invariably turned out to be insignificant. Thus, both the trial court and Latham agreed that the matter of what, if any, remedy would be appropriate was best decided in consultation with trial counsel.

In our view, this agreement reflects that there were sound reasons for electing not to bring the incident to the attention of the jury.[3] As the trial court observed, there is a substantial possibility that the juror did not ascribe any importance to the incident. To disrupt deliberations in order to haul her into court to inquire about the encounter risked highlighting the event, emphasizing its significance, and extending it to other jurors.

We find nothing in either the trial record or the postconviction record to rebut the presumption that trial counsel made a strategic decision not to ask for remedial measures. Latham testified that he discussed this incident with trial counsel before he informed the court about it, but did not testify about the substance of that discussion. Moreover, the trial court advised Latham that its usual response to a juror sighting during the course of a trial is to ask the juror about the incident, then assured Latham that he could discuss this and other options with trial counsel. The next day, trial counsel specifically told the court that he would discuss Latham's options with him. Latham conspicuously does not deny that such a discussion occurred.

Furthermore, we disagree with the postconviction court that a strategic decision not to take a juror out of deliberations, in order to question her about what Latham himself admits was a momentary glimpse of him in shackles in transit, falls below the standards for reasonable representation. As the Court of Appeals has recognized, one inadvertent viewing of a defendant in handcuffs, even while in the court-

---

**3.** Although a *voir dire* or curative instruction presumably would have been focused on Juror No. 4, it would be reasonable for counsel also to be concerned that other jurors might inquire why the trial court was calling one juror out of deliberations for special questioning or instructions.

room, does not necessarily establish a need for corrective measures. *See Bruce v. State*, 318 Md. 706, 721, 569 A.2d 1254 (1990) (1993)(defendant was not denied a fair trial as result of jury's inadvertent sighting of deputies taking handcuffs off as he was led into courtroom, or by presence of uniformed and plainclothes courtroom security officers stationed near defendant).

■ To be sure, the sighting that did not merit *sua sponte* relief in *Bruce* involved only handcuffs. In contrast, this sighting included handcuffs and shackles, and the issue is whether trial counsel was prejudicially ineffective in failing to ask for corrective measures. But we find *Bruce* instructive in establishing that not all juror sightings of a restrained defendant are so inherently prejudicial as to require corrective measures by the trial court. Furthermore, the logical corollary to *Bruce* is that not all such sightings require trial counsel to request corrective measures.

Here, in contrast to *Bruce*, the inadvertent glimpse of the defendant was by a single juror rather than the entire jury. It occurred in the midst of jury deliberations, rather than during the trial. And it occurred outside the courtroom, as Latham was being transported away from the courthouse. In these circumstances, it is reasonable for trial counsel to question whether the juror viewed the security measure as merely standard courthouse policy, rather than as specific evidence of the defendant's dangerousness. Indeed, as the trial court explained to Latham, most jurors find little or no import in such a sighting.

The postconviction court held that trial counsel's failure to request *voir dire* in these circumstances was unreasonable and prejudicial. We disagree, for the reasons set forth above. As the trial court recognized when it downplayed the sighting, one juror's inadvertent mid-deliberation sighting of Latham in shackles as he boarded a vehicle leaving the courthouse was not so inherently or presumptively prejudicial to his defense as to make it unreasonable for trial counsel to make a strategic decision to "let sleeping dogs lie." *Compare, e.g., Ghent v.*

Woodford, 279 F.3d 1121, 1133 (9th Cir.2002)("jury's 'brief or inadvertent glimpse' of a shackled defendant is not inherently or presumptively prejudicial"); *Dupont v. Hall,* 555 F.2d 15, 17 (1st Cir.1977)(inadvertent observation of defendant in custody "is to be avoided so far as possible," but it is not "as serious as is always sought to be maintained" so that "the emotional impact of seeing the defendant in custody is [not] necessarily hostile—it may be quite the reverse"), *with Jackson v. Washington,* 270 Va. 269, 619 S.E.2d 92, 96 (2005)(ineffective assistance where there was no valid strategy for failing to object to defendant being tried before a jury wearing a jail jumpsuit); *In re Davis,* 152 Wash.2d 647, 101 P.3d 1, 32 (2004)(ineffective assistance based on failure to object to shackling during sentencing proceedings that resulted in death sentence). That conclusion is bolstered by the evidence that Latham discussed the incident with trial counsel.

We hold that the postconviction court erred in granting a new trial on the ground that trial counsel was prejudicially ineffective in representing Latham with respect to the juror inadvertently seeing him in shackles. Because the court also considered trial counsel ineffective as a result of two other alleged deficiencies, we shall proceed to address those below.

## II.

### Failure To Request Self–Defense Instructions

 The State challenges the postconviction court's criticism of trial counsel's failure to request a self-defense jury instruction, arguing that it rests on the mistaken premise that it was unreasonable to refrain from offering the jury a self-defense theory as an alternative reason to acquit or convict on a lesser charge. We agree. The record shows that trial counsel acted reasonably in selecting and arguing to the jury a different and factually inconsistent defense theory, *i.e.,* that Latham was an innocent bystander who did not shoot Coleman. Trial counsel's chosen theory was consistent with the fact that no weapon was found on or near Latham, even though police arrived within "10 seconds" of the shootings.

 Md. Rule 4–325(c) provides that a "court may, and at the request of any party shall, instruct the jury as to the applicable law[.]" "[A] defendant is entitled to have the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered are inconsistent." *Sims v. State*, 319 Md. 540, 550, 573 A.2d 1317 (1990). Except in rare cases of plain error, however, failure to request an instruction waives a defendant's right to complain that it was not given. *See* Md. Rule 4–325(e).

 "A killing is justifiable or excusable if committed in self-defense." *Roach v. State*, 358 Md. 418, 429, 749 A.2d 787 (2000). "Perfect self-defense is a complete defense and results in the acquittal of the defendant[,]" whereas imperfect self-defense mitigates a murder charge to manslaughter by negating a finding of malice. *See id.* at 429–31, 749 A.2d 787. The critical difference between the two defenses is that a defendant's belief that he was in immediate danger of death or serious injury must be reasonable to raise a perfect self-defense claim, whereas an imperfect self-defense claim lies when the defendant's belief is unreasonable, albeit honest and actual. *See id.*

The Court of Appeals has recognized that a self-defense instruction may be warranted by the presentation of "some" evidence that would support it:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says "some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." . . . It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden.

*Dykes v. State*, 319 Md. 206, 216–17, 571 A.2d 1251 (1990).

Latham persuaded the postconviction court that trial counsel acted unreasonably in failing to ask for a self-defense

instruction after the State "injected the theory of self-defense in this case" by presenting evidence that Coleman provoked Latham to shoot in self-defense by being the first to pull out a gun. Latham relies on the following eyewitness testimony by Coleman's young cousin, Michael Parker, that Coleman pulled his gun on Latham before Latham pulled or fired his gun.

[Prosecutor]: Where did you see the defendant get the gun?

[Parker]: From the back of his pants. In the back.

Q: Okay. **Did your cousin have any gun out at that time?**

**A: Yes.**

Q: Who fired the first shot?

A: The defendant.

Q: **What was your cousin doing? Did you see what he was doing?**

**A: He was pulling out his gun.**

Q: **Did he have it out yet when the defendant fired at him?**

**A: Yes.**

Q: **Where was he holding it?**

**A: In his hand.**

Q: **In his hand. What was he doing with it?**

**A: He was ready to shoot back at him.**

Q: And what did the defendant do?

A: He kept shooting at him. He shot him twice and then my cousin Harvis had shot him in his leg. (Emphasis added.)

Parker's testimony that Coleman was the first to draw his weapon was not anticipated in opening statements by either the prosecution or the defense.[4]

---

**4.** In opening statement, trial counsel presented the bystander theory, while the prosecutor put the gun in Latham's hand, telling the jury that Coleman "didn't pull that gun out until he got shot. He was defending himself once he had been shot."

 As a threshold matter, the fact that trial counsel's bystander " 'strategy was ultimately unsuccessful does not mean that it was an unreasonable choice.' " *State v. Gross*, 134 Md.App. 528, 553, 760 A.2d 725 (2000) (citation omitted), *aff'd*, 371 Md. 334, 809 A.2d 627 (2002). Looking at the trial record from trial counsel's pre-trial vantage point, we conclude the bystander strategy was reasonable. This theory had the advantage of being a simple one that at least one juror might have believed. The conspicuous absence of the gun used to shoot Coleman was potentially powerful evidence, especially when considered in light of the responding police officer's claim that he arrived at the scene within 10 seconds of shots being fired. In addition, there was testimony that the police did not find the gun despite a thorough search, with no countervailing evidence that Latham got rid of the gun by throwing it somewhere in the few seconds after Coleman shot him in the leg and before the officer arrived. Nor was there any evidence that Latham had an accomplice who might have taken the gun from the scene.

Although the gunpowder residue on Latham's hand undermined the bystander theory, trial counsel effectively cross-examined the State's expert witness, by establishing that there were two possible ways in which Latham could have gotten residue on his hand without being the shooter (i.e., by touching his own wound or being near when another person fired the weapon). Thus, the jury had to weigh the likelihood of the State's contention that Latham shot and got rid of the gun within 10 seconds, while lying wounded in the street, against the likelihood of the defense contention that Latham did not shoot the gun, but got gunpowder residue on his hand either some other way or at some earlier time.

After reviewing the trial and postconviction records, we conclude that it was not below the standard of effective representation for trial counsel to forgo a self-defense theory in order to avoid contradicting the bystander theory on which he proceeded to trial. There is no suggestion that counsel's strategic selection of the bystander defense resulted from a misunderstanding of the law. *Cf. State v. Peterson*, 158

Md.App. 558, 597, 857 A.2d 1132 (2004) (failure to pursue a battered spouse defense constituted ineffective assistance when it stemmed from a misunderstanding of the law). When Parker's testimony raised the possibility of an alternative self-defense scenario, trial counsel had to make a strategic decision whether to ask the jury to consider two mutually exclusive factual scenarios. Although Latham suggests that trial counsel merely had to ask for a jury instruction on self-defense, such a request could only be necessary to meet the reasonableness standard if the self-defense alternative had to be argued to the jury. A contrary position would be tantamount to holding anomalously that counsel was unreasonable for failing to request a jury instruction based on a factual scenario that he reasonably did not ask the jury to believe.

Asserting factually inconsistent defenses is widely considered to be a poor criminal defense tactic, because it undermines the defendant's credibility by suggesting to the jury that the defense is merely "throwing out possible scenarios" in the hope that one will "stick," instead of giving a truthful account of what happened. *See, e.g., Middleton v. Roper*, 455 F.3d 838, 848 (8th Cir.2006) ("while presenting inconsistent theories or defenses may be plausible in some cases, at other times it may not be sound trial strategy"), *cert. denied*, 549 U.S. 1134, 127 S.Ct. 980, 166 L.Ed.2d 743 (2007); *Wilson v. United States*, 414 F.3d 829, 831 (7th Cir.2005) ("defendant who advances an inconsistent argument may shoot himself in the foot by ... making the defense seem unprincipled"), *cert. denied*, 546 U.S. 1128, 126 S.Ct. 1116, 163 L.Ed.2d 923 (2006). This is particularly true when the alternatives are so patently incompatible, as in the case of self-defense and the bystander theory advanced in this case.

On this record, Latham did not rebut the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. We hold that trial counsel's failure to request a self-defense jury instruction did not fall below the standard of reasonable care.

## III.

### Evidence Pertaining To The Bullet–Proof Vest

██ With respect to the post conviction court's finding that counsel was ineffective in failing to pursue or present mitigating evidence explaining that Latham routinely wore a bullet-proof vest due to prior attacks, the State argues that the postconviction court erred in determining that Latham's counsel should have introduced such evidence of Latham's prior altercations in his neighborhood. We again agree.

Nothing in the record rebuts the presumption that counsel's failure to present such evidence was a tactical decision, designed to avoid informing the jury of Latham's history of violent conflict in the neighborhood, which might have led the jury to conclude that Latham was dangerous and provocative, rather than supporting the bystander defense. As in *Oken v. State*, 343 Md. 256, 286–87, 681 A.2d 30 (1996), *cert. denied*, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997), counsel was not ineffective for electing not to present "double-edged sword" evidence that might have turned the jury against his client. *See id.* (no post conviction relief arising from failure to develop evidence of drug and alcohol abuse that could "have angered the jury"). In any event, Latham also failed to establish prejudice given that the State offered the body armor evidence in support of its premeditation theory, but the jury acquitted Latham of first degree murder.

### Conclusion

██ We recognize that,

[e]ven when no single aspect of the representation falls below the minimum standards required under the Sixth Amendment, the cumulative effect of counsel's entire performance may still result in a denial of effective assistance. . . . That is, numerous non-deficient errors may cumulatively amount to a deficiency. . . . As ever, the touchstone is whether, in view of all the circumstances, our confidence in the result has been undermined by counsel's failings.

*Cirincione v. State,* 119 Md.App. 471, 506, 705 A.2d 96 (citations omitted), *cert. denied,* 350 Md. 275, 711 A.2d 868 (1998). *See Bowers v. State,* 320 Md. 416, 436, 578 A.2d 734 (1990).

Here, our independent review of the trial and postconviction records satisfies us that Latham's conviction has not been undermined by failings on the part of trial counsel. To the contrary, we think the record shows that counsel's failure to request corrective measures in connection with the juror sighting incident, his failure to request a self-defense jury instruction, and his failure to present evidence that Latham wore a bullet-proof vest because he had been involved in prior shootings represented sound trial strategy that fell within the range of reasonable professional representation. We therefore reverse the postconviction court's judgment awarding Latham a new trial.

**JUDGMENT REVERSED. COSTS TO BE PAID BY APPELLEE.**